RUFUS-ISAACS ACLAND & GRANTHAM LLP
ALEXANDER RUFUS-ISAACS, State Bar No. 135747
*aisaacs@rufuslaw.com*
232 N. Canon Drive
Beverly Hills, California 90210
Telephone: (310) 274-3803
Facsimile: (310) 860-2430

Attorneys for Plaintiff ALBERT GOODMAN

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

ALBERT GOODMAN, an individual,

Plaintiff,

v.

BERT DOHMEN, an individual, and DOES 1-10, inclusive

Defendant.

CASE No. CV15-00020 FFM

**DECLARATION OF ROBERT E. CONNER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Date: May 3, 2016
Time: 10:00 a.m.
Crtrm.: 580

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

DECLARATION OF ROBERT E. CONNER

I, Robert E. Conner, declare as follows:

1. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

2. I am a founding officer and testifying expert of Thornapple Associates, Inc. ("Thornapple"), a firm that has been engaged for over 32 years in providing expert services primarily in connection with investment-related disputes to a broad clientele, including the Securities and Exchange Commission, the Internal Revenue Service, U.S. and state-level attorneys general, banking, securities and insurance commissioners, municipalities, broker-dealers, investment advisers, hedge funds, and various institutional and individual investors, both U.S. and foreign, in connection with arbitrations, trials and regulatory proceedings involving securities, commodities, foreign currency and commercial disputes.

3. I earned an MBA at Harvard Business School, a Master's in Public Administration (MPA) at the John F. Kennedy School of Government, Harvard University, and completed Ph.D. studies and written and oral doctoral examinations, but for the final dissertation and degree completion in Government, Economics and Statistics at Harvard University, with cross-studies in support thereof at the Massachusetts Institute of Technology.

4. My experience in the securities industry spans 39 years and encompasses both the broker-dealer 'sell side' as well as the investment management 'buy side' of the industry. As a registered representative of two investment banking firms, I provided institutional research and sale/trading coverage to a range of mostly institutional clientele, including banks, investment managers,

mutual fund and hedge fund managers, foundations and endowments, pension and profit sharing plans, municipalities and very high net worth individuals.

5. In addition to managing fully discretionary Client investment portfolios on behalf of two brokerage firms, as Director, Options Management for the Prudential Insurance Company of North America in both the bond and stock departments, I managed portfolios employing stocks, bonds, convertible securities, and both specific-issue and equity index options and futures contracts to hedge market risk in both proprietary accounts and two types of mutual funds, established and utilized a trading network of multiple prime and executing brokers and custodial banks, and inaugurated a multi-billion dollar stock lending program.

6. As President of an independent investment management firm, I was one of two portfolio managers exercising full discretion over multiple institutional client portfolios employing primarily equity securities in pursuit of after-tax investment objectives in junction with the use of derivative hedging instruments to managed portfolio market risk, and supervised the trading activities of the firm's trading desk.

7. I have been individually involved in over 850 investment-related securities and commodities disputes on behalf of Thornapple, have testified on approximately 165 occasions in various U.S. and international arbitration forums, federal, state and foreign courts, as well as regulatory and disciplinary hearings. Cases have involved issues attendant to the investment management and trading of both leveraged and unleveraged portfolios, margin and portfolio margin, prudence, suitability, adequacy of risk disclosures and/or the exercise of due diligence by trustees, investment managers, accountants and other fiduciaries in connection with asset allocation, strategies or particular financial instruments in consideration of investment objectives and risk tolerances of the various investing entities and beneficiaries, as well as theory, methodology and calculation of damages attendant to such cases, including a number of Ponzi schemes.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

8. On behalf of Thornapple I have provided expert services to the Securities and Exchange Commission on approximately twelve occasions and on several large and complex investment matters by the Internal Revenue Service, a number of state-level Securities, Banking and Insurance Commissioners, as well as a wide range of investment management firms, hedge funds, mutual funds, broker-dealers, prime brokers, banks, insurance companies, trustees, bankruptcy trustees, law firms, heirs and beneficiaries, as well as a wide range of both individual and institutional investors, both U.S. and foreign.

9. Opinions expressed in this declaration are based upon my education, training and work experience in the securities industry, to include what I regard to be sufficient relevant facts and data, as well as industry standards, regulations and best practices in the areas of my professional experience.

10. My curriculum vitae, including my education, work experience, publications and a list of matters in which I have testified at deposition, trial and arbitration within the last four years is attached as Exhibit "1."

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

## ASSIGNMENT AND SCOPE

11. Thornapple has been retained by Albert Goodman to work with the law firm of Rufus-Isaacs Acland & Grantham, LLP in this matter. As Thornapple's designated expert on this matter, I have prepared this Declaration to opine on certain issues related to Plaintiff's Opposition to Defendant's Motion For Summary Judgment in this action.

## SUMMARY OF OPINIONS

12. I have formed the following opinions with regard to this matter based upon my review of all documents provided to me to-date a list of which is attached as Exhibit "2."

a. The Fund should have neither commenced nor continued in business with only $1.2 million in assets because the invested capital was not sufficiently large to provide the economies of scale required for the Fund manager to reasonably provide the "desirable risk adjusted returns" which the PPM states "will be established" by the Fund.[1] The administrative fee structure and expense allocation of the Fund made it inherently uneconomic for any single investor to become the sole investor in the Fund or any hedge fund.

b. The Fund should not have neither commenced nor continued in business with Goodman as the only outside investor since such an arrangement is inherently uneconomic compared to an individual brokerage account.

c. Dohmen employed a degree of leverage in the Fund that induced such high variability of return to the Fund as to preclude any adherence to a viable longer-term strategy . . .designed to be much more conservative than [his] own trading . . ." and could be reasonably expected to provide "desirable risk adjusted returns."

d. Dohmen demonstrated inattentiveness and lack of prudent response to margin warnings, and even notices of imminent liquidation of Fund positions, emailed to him by Interactive Brokers (IB), the firm that he himself had selected as the prime broker to the Fund, which thereby caused the Fund to incur greater losses than were it less leveraged, less often in margin deficiency, more closely monitored and more responsibly and professionally managed.

e. Dohmen, who had no experience in forming or managing a hedge fund, evidenced such a significant lack of understanding of the provisions governing the administration of the Fund and the communication and reporting

[1] PPM, September 2009, p. 39; Dohmen000442

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

requirements to Goodman as an investor in the Fund as to be severely negligent and lackadaisical in his performance of the functions attendant to those positions.

OBSERVATIONS IN SUPPORT OF OPINIONS

13. The Fund was too leveraged to adhere to a long-term strategy.

a. The use of margin leverage by the Fund is reflected in monthly reports as monthly, Quarter to Date and Year to Date "margin interest" paid on a loan balance.[2]

b. Volatility is a measure of the variability of return on investment.

c. Over the course of 2012, monthly returns of the Fund, positive or negative, exceed 8% in 11 out of 12 calendar months, 9% in 9 of them, 10% in 8, and 12% in 7. On a cumulative basis, the Fund was down by 1/3 by the end of April, and after recovering to within 11% of its 2012 beginning net equity by the end of August, it was back down to ½ its starting net equity two months later at the end of October on its way to 70% a cumulative decline by year-end.[3]

d. The 2012 monthly and cumulative returns are so volatile as to be indicative of a hedge fund, ostensibly being managed in pursuit of a long-term strategy, to instead be relatively 'out of control' from one sizeable short-term move to another.

e. Dohmen's deposition testimony reflects his perspective on the effects of market volatility in 2012 on his management of the Fund: "High volatility . . . just like the market. . . . For example, gold in 2012 had a 41 percent rally in a very short time, a matter of weeks and that was followed by 60 percent decline.

---

[2] FA01488, Croesus Fund, L.P., for December 2012

[3] Source: Croesus Fund Monthly Returns reports, Jan-Dec, 2012 (FA Jan12, 01272, 01294, 01317, 01342, 01368, 01392, 01416, 01440, Nov12, 01488)

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

And I think that decline took maybe three, four months. So the volatility was extreme in the precious metals sector. It was very, very difficult to make money. . . . Nobody could handle that volatility."[4] However, the risk of sudden volatility and price swings in the market price of precious metals was already known to Dohmen. In fact, the PPM specifically noted that "the precious metals sector is known for very sharp corrections during a bull market. These are designed to shake off the weak holders. Generally, the Partnership will ride through such corrections, although it will try to lighten exposure or hedge. . . . A professionally managed approach may limit the damage. There are times to make very important decision if you don't want to give back all of the bull market profits. Should an important trend change be detected in our work, we would hedge the positions, close out partial or all long positions, or even go short or buy the bear-ETFs in this sector in order to profit from a downtown. At such critical turns the investor wants to have an investment manager for the sector who has years of experience."[5]

f. The extended financial leverage of the Fund, by thinning the buffer of net equity that insulates the Fund from maintenance margin calls, prevented the Fund from adhering to a long-term strategy by depriving it of the ability to either "ride out" market corrections or the flexibly to respond to short-term adverse market movements with a "professionally managed approach."

g. The volatility of the fund was likewise high in 2013, during which the best and worst one-month return were 32.64% & 32.87%, while the cumulative year-to-date peaked at 48.73% before plummeting to minus-44.49% before ending the calendar year at minus-32.56%.[6]

---

[4] Dohmen deposition, p. 239, l. 11-25,

[5] PPM, September 2009, p. 4, 'Precious Metals Sector' (Cont. from prior page); Dohmen000406

[6] Croseus Fund LP 2013 PortfolioAnalyst report, Interactive Brokers, p. 9

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

h. Despite the continuation of high market volatility throughout 2013 and its foreseeable impact on the net equity of the Fund, Dohmen continued to demonstrate neglectful inattention to margin violation notices emailed to him, even to the point of occasioning eight successive email notices from IB to Dohmen over the course of three successive trading dates, September 5, 6 & 7, 2013, both during pre-trading and trading hours, that the Fund's "qualifying equity with your account (i.e., Equity with Loan Value) is insufficient to satisfy the margin requirement", first warning him that "IB reserves the right to liquidate positions without providing further notice in order to restore margin compliance", and, on the following day, "liquidation of positions may commence without further notice" for the same stated purpose.[7] As Dohmen was no stranger to receiving emailed margin violation notices, I view his failure to promptly remedy this margin deficiency insistently brought to his attention by the Fund's prime broker as gross mismanagement of the Fund by a fiduciary.

14. Dohmen was negligent in monitoring and responding to margin notices.

a. Interactive Brokers (IB), which was chosen by Dohmen as the prime broker of the Fund, is very capable and computerized in its margin notification to its customer base, and, because of its extensive involvement with options and other derivative positions, is one of the prime brokers that actively issues computer-generated intra-day margin warnings and deficiency notices. Such warnings are intended to put a customer on notice that IB may liquidate open positions without further notice to bring accounts into margin compliance if the customer does not timely remedy the problem, as is evidenced in the margin warning issued to the Fund on October 17, 2012 at 12:18 PM, followed less than a half-hour later by a notice that the Fund is in margin deficiency and that liquidation

---

[7] IB00417-424

of positions may commence without further notice, and then a third notice that the Fund, based on its then-current positions, will be in margin deficiency within 10 minutes, advising the Fund to examine its portfolio and reduce its margin exposure, and referring the Fund Manager to the 'lookahead' margin feature for on-line customer access to IB's margin computer system.[8]

b. In stark contrast to the very close attention IB pays as a prime broker to the intra-day margin status of its customer accounts, Mr. Dohmen's abject lack of appreciation of the importance of this type of notice was brought out in his deposition testimony when he was asked if he received margin notices of this nature,[9] Dohmen answered "I didn't receive them." When asked further if he regarded them as important, he added "If you continue to be in violation, yes. This is usually something you see when you log in to the admin portion of their website, which you don't do except when you want to retrieve a monthly statement." In actuality, Dohmen, received these margin violation notices via email from IB, a fact of which he testified as having no recollection. I view Dohmen's abject lack of understanding as to the standard means by which he received multiple emailed margin violation notices from the Fund's prime broker as markedly deficient.

c. When asked about the significance of receiving margin notices when the Fund was not in deficiency, but within 5% or 2% of the crossing over from a condition of margin excess to margin deficiency, Dohmen testified, "When you trade the market very frequently, you get these every day. Not every day, but you get them very frequently." These are among the same type of margin notices that he mistakenly testified that he doesn't normally see except when retrieving a monthly

---

[8] IB 00320, 00321,

[9] Dohmen deposition, Exhibit 57, Margin Violation Warning dated September 5, 2013, 9:28 AM emailed from Interactive Brokers Customer Service to Dohmen at "bert@dohmencapital.com".

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

statement. The idea that a hedge fund manager employing financial leverage could equate the importance of margin violation notices as something that can be adequately monitored on a monthly basis is beyond my comprehension, but which I view as consistent with Dohmen's inattentiveness to the risks of financial leverage.

d. Another type of margin-related notice issued by the Fund's prime broker is a Notice of Buy-In, which is occasioned by a need to close-out (cover) an open short stock position, either due to a margin deficiency (this Buy-In Notice occurred on September 11, 2013, only three days after the series of margin violation notices mentioned in paragraph 14h)[10] or, on this occasion, during market trading hours, by the inability of the Fund's prime broker to borrow or re-borrow shares of the underlying short stock in order to "maintain the borrow" in order to allow the Fund to continue being short the stock, and therefore advising Dohmen to cover his 5,000 share short position in INDY within the next-hour-and-a-half by 4 PM Eastern time since "SEC regulations now strictly enforce (borrowed stock) delivery obligations."

e. In my opinion, Dohmen does not understand the intertwined operational considerations attendant to the borrowing of shares in connection with the maintenance of of short stock positions in a prime brokerage account and subject to regulatory margin collateral requirements with which the prime broker must comply.

f. When asked to explain the significance of a Notice of Buy-In, Dohmen testified,

"A buy-in is when you are short the stock.,,, you're, in effect, borrowing stock from the brokerage firm. The brokerage firm is holding the share certificates for other

[10] IB0427, Notice of Possible Buy-In, September 11, 2013 at 11:30 AM PST (14:30 EST during market trading hours)

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

clients. So, in effect, you borrow them. Now, if that person that owns those shares say: I want those shares back because I want to do something with them, the you get a buy-in, okay? And then you have a choice. Either ask them to go borrow from someone else or just close out your short position."[11]

g. Dohmen's testimony is incorrect. The Fund doesn't 'in effect' borrow shares from IB, its prime broker; the Fund actually does borrow shares from the prime broker. Before the Fund could execute a short sale to establish such a short stock position, it had to first request a 'look-up' by the prime broker to 'locate' shares to ensure their availability to be borrowed[12] so that shares may be delivered to the buyer on the contra-side of the Fund's short sale on the settlement date of the transaction. Provided that the prime broker is able to borrow such shares, the most important requirement of maintaining a short stock position is 'maintaining the borrow', which means that, in Mr. Dohmen's example, were the initial lender from which the prime broker borrowed shares to lend at a mark-up to the Fund to request the return of the borrowed shares, that would not in itself generate a Buy-In notice. Instead, the prime broker would automatically locate and borrow separate shares of the same stock and, if able to do so, would substitute those borrowed shares in place of the original borrowed shares to 'maintain' the Funds short stock position. Only in the event that the prime broker was unable to locate any shares of that stock available to be borrowed would the prime broker issue a Buy-In notice to the Fund, advising the Fund that either the Fund could timely buy-to-close the open short stock position, or the prime broker, acting on its own, would do so, with whatever adverse market impact may attend such transaction. This risk stems from an adverse

---

[11] Dohmen Deposition, p. 245, l-20

[12] Such shares may be borrowed from another customer account of the same prime broker, or from another broker-dealer, bank, insurance company, pension fund or other intermediary that owns the same stock and is willing and able to lend it.

market impact occasioned by a Buy-In which may also arise due to a margin collateral deficiency that could force a buy-in of a short stock position Fund at a time when such closing purchase transaction would not have been undertaken as a investment decision taken in the course of managing a Fund strategy, and is actually a risk disclosed in the PPM,[13]but about which, in his deposition, I find Dohmen's understanding defective and his attitude dismissive.

15. Dohmen acted in conscious disregard of Goodman's best interest.

a. As brought out in Dohmen's deposition, on 7 December, 2011, a week after Goodman's initial $500,000 investment in the Fund, Dohmen advised Fund Associates, referring to Goodman, that "we have another $500K for the same investor in the bank," adding "There is a possibility of a year end rally, so we should get it in the markets." Dohmen then proceeded to see if an intra-month date, December 12th, could be used to commit Goodman's second capital infusion into the Fund. The fact that Dohmen based his expressed urgency to infuse Goodman's incremental $500,000 capital contribution to the Fund so as to be invested in time to benefit from an expected year-end market rally smacks of the very type of short-term trading mentality that stands in contrast with his own representations and the PPM that the Fund would adhere to a more conservative long-term strategy than his own trading.

[13] PPM, September 2011, p. 40, 'Short Selling,' "Because short sales must .be marked to market daily, there may be periods when short sales must be settled prematurely, and a substantial loss would occur." Technically, the PPM is incorrect. Daily marked-to-market pricing does not require a short sale to be 'settled prematurely,' instead it is the unavailability of a lending source to maintain a borrowed share position to satisfy the margin requirement associated with a short stock position, which is subject to daily pricing, which can require the execution of a purchase transaction in that stock in the open marketplace in the event the custodial, or prime, broker cannot locate shares to borrow, necessitating the early close-out of the short position, with attendant upward (adverse) market impact.

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

b. Only one month earlier, on November 11, 2011, Dohmen was trying to expedite infusing Goodman's first $500K into the Fund. At which time he told Goodman that he had not had time to speak to more than two people about investing in the Fund. It was brought out in deposition that Dohmen's explanation to Goodman was not truthful, and instead the reason he had not approached prospective investors on or about November 26th was that Dohmen "wouldn't make a big effort" to bring in additional investors "until we [the Fund] could report some gains," yet only two weeks later Dohmen is urgently trying to infuse the Fund with Goodman's capital in time for a possible year-end market rally. Dohmen, in effect, was using Goodman's money to try to bolster the Funds's performance by year-end for purposes of attracting additional investors, a clear subordination of Goldman's personal best intersts to Dohmen's fund-raising efforts.

16. In my opinion, Dohmen was negligent and lackadaisical in the performance of his job functions as both Fund Manager and General Partner.

a. In his deposition testimony, Dohmen testified not only that Goodman was not very keen to be the only investor in the Fund, but that Goodman "never gave me a clue." Needing a "clue" to what should be obvious indicates an ignorance of the economics of hedge funds to the point of obliviousness, which I find to be unique in a hedge fund manager, especially one who charges expenses to the hedge fund he manages that are appropriately charged to the management firm itself, and which was a topic of discussion between Dohmen and his selected administrator, Fund Associates.

b. Likewise, Dohmen charged office rent to the Fund, despite being advised that such was not provided for in the PPM, and that office rent is normally borne by the management firm.

c. As of February 13, 2013, Dohmen advised Fund Associates that he couldn't remember if there was an annual audit requirement for the Fund and was

advised by Fund Associates that he had "agreed to provide audited financials on an annual basis."[14] This oversight had persisted for quite awhile, as evidenced by the fact that no accounting reserve for audit expenses had been set aside; hence Dohmen's suggestion to Fund Associates as part of his inquiry, "If there is a requirement, I could see if he wants to waive that in order to save money."

d. Inattention to the details of the administrative requirements of the Fund imposed a cost on Goodman's contributed capital that impaired the net profitability of his investment.

e. Among the expenses charged to the Fund were organizational expenses of both a domestic and British Virgin Islands fund, which was passed through to Goodman as the sole investor in the Fund, even though Goodman only invested in the domestic Fund and the British Virgin Islands fund was never created. I infer that this was error on the part of a fiduciary that conforms to a lackadaisical pattern of inattention to details, and a failure to exercise assiduous care in learning, especially on one's first outing as a hedge fund manager, as to the proper allocation of expenses between a hedge fund and the firm managing it.

17. No reasonable and informed investor would have elected to be a sole investor in the Fund because the administrative fee structure would be uneconomic for only one investor.

a. As the only member of the Fund, Goodman was paying all the fees and expenses, defeating one of the primary economic incentives for funds of all types, i.e., the sharing of expenses among investors.

b. Goodman would have been better off to have had a separate brokerage account managed with full discretion by Dohmen without the added expenses and limited access to his own capital inherent in a hedge fund structure.

---

[14] FA01909, 01910

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

18. Dohmen's lack of understanding of the requirements attendant to the establishment and management of a hedge fund extended to a lack of understanding of the distribution and record keeping of the Fund's principal risk disclosure document, a Private Placement Memorandum (PPM). In fact, at his deposition, Dohmen testified that the term "Private Placement Memorandum" and the term "Prospectus" are "interchangeable", not only in his use of the terms, but throughout the "industry."[15]

a. This accounts for Dohmen's repeated use of the non-existant term Private Placement Prospectus, or "PPP," during the course of his deposition. Of course, a Prospectus is a public document filed with the S.E.C. in connection with public offerings. By contrast, a PPM is a private disclosure document designed to be circulated on a limited basis to Accredited Investors and are therefore identified by number on each copy when provided to a specifically named prospective investor, and an administrative record is maintained of such provision in part to ensure that such PPM is returned in the event that a prospective investor, upon its review, declines to invest in the security or fund being offered, so as to prevent too many copies finding their way into the hands of prospective investors which, under certain circumstances, could jeopardize the offering's standing as "Private."

b. This may also explain why, at his deposition, Dohmen could not even recall whether a PPM that he claimed to have sent to Goodman was numbered, and why he could not produce a record that such PPM had been conveyed, electronically or otherwise, to Goodman.

[15] Dohmen deposition, p. 138,

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed April 12, 2016, at West Palm Beach, Florida.

Robert E. Conner

RUFUS-ISAACS ACLAND & GRANTHAM LLP
232 N. CANON DRIVE
BEVERLY HILLS, CALIFORNIA 90210
Tel (310) 274-3803 • Fax (310) 860-2430

15
DECLARATION OF ROBERT CONNER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT