**HOLMES, TAYLOR & JONES LLP**
Andrew B. Holmes (SBN: 185401)
abholmes@htjlaw.com
Matthew D. Taylor (SBN: 220032)
matthew.taylor@htjlaw.com
617 South Olive Street, Suite 1200
Los Angeles, California 90014
Tel: (213) 985-2200
Fax: (213) 973-6282

*Attorneys for Defendant Bert Dohmen*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT GOODMAN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>BERT DOHMEN, an individual,<br>Defendant. | Case No. CV15-00020 FFM<br><br>**DEFENDANT BERT DOHMEN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date: November 1, 2016<br>Time: 10:00 a.m.<br>Courtroom: 580 |

Pursuant to Rule 52 of the Federal Rules of Civil Procedure and Local Rule 52, defendant Bert Dohmen hereby submits the following Proposed Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

### Dohmen and the Croesus Fund

1. Defendant Bert Dohmen ("Dohmen") is the founder and President of Dohmen Capital Holdings, Inc. ("Dohmen Capital"), a company that provides analysis, research and advice for traders and investors.

2. Since 1977, Dohmen Capital has published various financial newsletters including the "Wellington Letter," the "Smarte Trader" and the "Fearless ETF Trader." These newsletters set forth Dohmen's personal opinions, analysis and forecasts regarding the global economic outlook and investment markets.

3. Goodman was a subscriber to both the Wellington Letter and Smarte Trader, as well as other financial periodicals.

4. In 2011, Dohmen decided to set up a hedge fund called the Croesus Fund. Hedge funds are largely unregulated investment pools open only to "accredited investors." To qualify as an "accredited investor" an individual must have a net worth of at least $1 million, excluding the value of his or her primary residence, or to have earned at least $200,000 per year in personal income over the prior two years.

5. At Dohmen's direction, Croesus Fund, L.P. was formed on March 3, 2011 as a Delaware limited partnership.

6. According to the "Investment Objective" section of the Croesus Fund, L.P.'s Private Placement Memorandum ("PPM"), the overall objective of the Croesus Fund was "…to achieve superior risk-adjusted returns by utilizing a non-diversified macro strategy." (Exh. 57, at p.3.)

7. That section of the PPM, under the subheading "Limits of Description of Investment Program" also states:

The General Partner is not limited by the above discussion of the

investment program. Further, the investment program is a strategy as of the date of this Memorandum only. ***The General Partner has wide latitude to invest or trade the Partnership's assets, to pursue any particular strategy or tactic, or to change the emphasis without obtaining the approval of the Limited Partners.*** The investment program imposes no significant limits on the types of instruments in which the General Partner may take positions, the type of positions it may take, its ability to borrow money, or the concentration of investments. The foregoing description is general and is not intended to be exhaustive. Prospective investors must recognize that there are inherent limitations on all descriptions of investment processes due to the complexity, confidentiality, and subjectivity of such processes. In addition, ***the description of virtually every trading strategy must be qualified by the fact that trading approaches are continually changing, as are the markets invested in by the General Partner***. (emphasis added). (Exh. 57, at p. 8.)

8. In the "Risk Factors" section, under the subheading "Investment and Trading Risks", the PPM also discloses: "The Partnership's investment program will utilize such investment techniques as option transactions, limited diversification, margin transactions, short sales and futures and forward contracts, which practices can, in certain circumstances, maximize the adverse impact to which the Partnership may be subject." (Exh. 57, at pp. 23-24.)

9. Macro Wave Management, LLC ("Macro Wave"), a Nevada limited liability company, is the general partner of Croesus Fund, L.P.

10. Dohmen is the sole member of Macro Wave.

11. Investors in the Croesus Fund become limited partners in Croesus Fund, L.P. under the terms of the Limited Partnership Agreement. (Exh. 145.)

### Albert Goodman

12. Plaintiff Albert Goodman ("Goodman") first met Dohmen in approximately 1999, when he contacted me and visited me in Hawaii while he was vacationing there.

13. Goodman earned both a bachelor's (in business) and masters of business administration degree from USC.

14. Goodman has not been employed, in a traditional sense, since the early 1990s.

15. Since approximately 1982, when a family business was sold, Goodman's

primary source of business has been his investments.

16. Prior to investing in the Croesus Fund, Goodman had previously held as much as $1 million in precious metal investments.

17. Since 2008, Goodman has invested approximately $2 million into RivalFly, a privately held limited liability company.

18. Goodman owns real estate in Costa Rica, Illinois and Wisconsin and estimates that more than half of his wealth is in real estate.

19. In approximately 2011, plaintiff invested (and lost) $100,000 in a company called Lift Spray, which produced a caffeine mouth spray.

20. On two occasions, Goodman had invited Dohmen to attend the Milken Global Conference with him.

21. Over the years, Goodman had asked Dohmen to invest in various businesses in which Goodman was involved but Dohmen declined to do so.

22. As of November 2015, Goodman maintained investment accounts with six separate broker-dealers.

23. Goodman reads various financial newsletters and financial periodicals, including the Wellington Letter, Smarte Trader, the McClellan Report, and the Cabot Newsletter.

24. As of the fall of 2011, when Goodman invested in the Croesus Fund, Goodman's net worth was approximately $15 million.

25. The Court finds that Goodman is an experienced and sophisticated investor.

### Goodman's Investment in the Croesus Fund

26. Goodman and Dohmen first discussed Dohmen's plans to set up a hedge fund in May 2011, at a birthday party that Goodman threw for Dohmen at Goodman's home near Chicago.

27. Upon hearing of Dohmen's plans, Goodman immediately expressed interest in investing.

Holmes, Taylor & Jones LLP
617 South Olive Street, Suite 1200
Los Angeles, California 90014

28. By the fall of 2011, the Croesus Fund was ready to begin accepting investments and, on September 29, 2011, Dohmen wrote Goodman and inquired whether he wished to invest in the Croesus Fund. (Exh. 107.)

29. Later that same day, September 29, 2011, Goodman wrote Dohmen that he "would like to be a part of this investment fund…" (Exh. 107.)

30. Dohmen emailed Goodman a copy of the Subscription Agreement relating to Croesus, L.P. on October 15, 2011 (Exh. 146.) and, on November 7, 2011, Goodman signed the agreement and initialed each page thereof, agreeing to make an investment of $500,000 in the Croesus Fund. (Exh. 111.) Goodman wired these funds to the fund's bank account on November 14, 2011.

31. On December 1, 2011, Goodman signed an "Additional Subscription Request," indicating his desire to invest an additional $500,000 in the Croesus Fund. (Exh. 117.) These funds were wired to the fund's bank account in mid-December. (Exh. 118.)

32. Since the Croesus Fund accepted Goodman's signed Subscription Agreement and capital contribution, Goodman was bound by the Subscription Agreement (and, in turn, by the Partnership Agreement).

## PROPOSED CONCLUSIONS OF LAW

1. Goodman's Complaint, filed on January 5, 2015, states causes of action for 1) Fraud; 2) Promissory Fraud; 3) Fraud by Concealment; 4) Negligent Misrepresentation; 5) Breach of Fiduciary Duties; Securities Fraud; 7) Unfair Business Practices; and 8) Professional Negligence. (Dkt. # 1.)

2. On March 22, 2016, Dohmen moved for summary judgment. (Dkt. # 39.) In its ruling granting this motion in part and denying it in part, the Court dismissed all negligence-based causes of action, including the fourth cause of action for negligent misrepresentation and the eighth cause of action (for professional negligence) in their entirety, dismissed the seventh cause of action (for unfair business practices) and also dismissed the fifth cause of action for breach of Fiduciary Duty to

the extent it relied on a negligent and/or grossly negligent violation of any duty of care (leaving intentional concealment and violation of a duty of loyalty). Moreover, with respect to the remaining causes of action, the Court significantly narrowed the scope of such claims. (Dkt. # 55.) Plaintiff did not pursue the second cause of action for Promissory Fraud at trial, thus conceding that cause of action.

### The Scope of Goodman's Surviving Claims

3. The partnership agreement for Croesus Fund, L.P. provides that Delaware law applies (Exh. 145, at § 11.01.) The parties do not dispute that Delaware law applies to Plaintiff's common law claims.

### Fraud

4. Under Delaware law, a plaintiff claiming fraud must prove the following: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).

5. Justifiable reliance is an element of common law fraud. *H-M Wexford v. Encorp*, 832 A.2d 129, 142 (Del. Ch. 2003). Delaware courts have consistently held that sophisticated parties to commercial contracts may *not* reasonably rely on information they contractually agreed did not form a part of the basis for their decision to contract. *Id.* at fn. 18; *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555-56 (Del.Ch. 2001).

6. With respect to Goodman's first cause of action for intentional misrepresentation, the Court found a triable issues of fact only to the extent the claims was based on either: i.) the November 20, 2011 email, in which defendant allegedly falsely represented that other individuals had agreed to invest in the Fund (Exh. 143 (Dkt. # 55 at pg. 12:18-22); or ii.) the May 14, 2012 email regarding the "long term"

nature of plaintiff's investment. (Exh. 120)(Dkt. # 55 at pg. 16:4-16).

7. To the extent that these three claims were based on any other allegedly false statements by Dohmen, they were dismissed at the summary judgment stage. (*Id.*)

8. Based upon the evidence presented at trial, the Court concludes that Plaintiff has failed to meet his burden of demonstrating either that he *actually* relied on Dohmen's representations in making his decision to invest in the Croesus Fund; or that, even if he had, that such reliance would have been *reasonable* – or justifiable.

9. With respect to evidence of the lack of Goodman's justifiable reliance, in particular, the Court noted Goodman's sophistication and experience as an investor, his testimony that he chose to invest in the Fund based solely on his admiration for Defendant's investment newsletter and therefore did not actually rely on the allegedly false statement in deciding to invest; the fact that Dohmen and Goodman did not even discuss the number of investors in the Fund prior to Goodman's first $500,000 investment, thus belying Plaintiff's claim that this information was important to his investment decision; the evidence demonstrating that Goodman and Dohmen discussed the Fund's investment strategy so as to take a more active, short term trading approach and the evidence demonstrating that the May 14, 2012 email referred to the "long term" *outlook* that Goodman should take in evaluating the fund's performance rather than the conservative nature of the investments being made.

10. The Court also finds that there is a difference between a long-term investment and a conservative investment. Dohmen's statements about the long-term strategy for the Croesus Fund referred to how long an investor should stay in the fund, and did not relate to a particular risk profile for the Croesus Fund's investments. As such, the Court finds that the May 14, 2012 email did not contain any misrepresentations.

### Fraudulent Concealment

11. Goodman also failed to establish that Dohmen should be liable on a

fraudulent concealment theory.

12. "In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003). To prevail on a fraudulent concealment claim under Delaware law, a plaintiff must prove that the defendant "knowingly acted to prevent [the] plaintiff from learning facts or otherwise made misrepresentations intended to put the plaintiff off the trail of inquiry." *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006) (internal quotation marks omitted). If the plaintiff's claim is based on a theory of incomplete disclosure, the plaintiff must show that the statements at issue "were made with contemporaneous knowledge or reckless disregard of the information" which rendered the statements misleading. *Metro Comm'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004).

13. As with the other common law fraud claims, at the summary judgment stage, the Court narrowed the scope of plaintiff's actionable concealment claims to encompass only defendant's alleged concealment of the lack of other outsiders investors and (in May 2012) the Fund's alleged short-term investment approach. (Dkt. # 55 at pg. 17:16-18:2.)

14. In addition to the testimony at trial, the Court notes the various disclosures made by Dohmen in emails (Exhs. 110, 143, 149, 118), which he made clear that there were not yet any outside investors in the Fund, the PPM's disclosures of the types of investments the Croesus Fund would make (Exh. 57 at pp. 8, 23-24), various discussions between Goodman and Dohmen wherein, both oral and written, wherein they discussed that Dohmen's investment strategy included shorter term trading, and Goodman expressly approved such trading and the ongoing disclosures made by Dohmen relating to the Fund's investment performance. (Exh. 121.) Taken together, this evidence strongly refutes any suggestion that Dohmen was improperly concealing facts from Goodman.

15. As above, the Court also finds that there is a difference between a long-term investment and a conservative investment. Dohmen's statements about the long-term strategy for the Croesus Fund referred to how long an investor should stay in the fund, and did not relate to a particular risk profile for the Croesus Fund's investments. As such, there was no intention by Dohmen to conceal any facts from Goodman, and the Court finds that the May 14, 2012 email did not conceal the Croesus Funds' actual trading approach.

## Securities Fraud

16. Section 78j, subsection (b), of title 15 of the United States Code makes it unlawful for any person to use "manipulative or deceptive devices" in connection with the purchase or sale of securities. A plaintiff bringing a Section 10(b)(5) claim must establish the following: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

17. "Transaction causation is akin to reliance; it focuses on the time of the transaction and refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1118 (9th Cir. 2013). "[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys.*, 411 F.3d at 1025.

18. The portion of Plaintiff's claim for securities fraud that survived summary judgement and proceeded to trial essentially mirrors his common law fraud claims and is based solely on Dohmen's supposed misrepresentations regarding the number of investors and the May 2012 representation regarding the Croesus Fund's investment strategy.

19. As with the fraud and concealment causes of action, the Court notes

defendant's experience and sophistication as an investor, his testimony that he chose to invest in the Fund based solely on his admiration for Defendant's investment newsletter and therefore did not actually rely on the allegedly false statements in deciding to invest; the fact that Dohmen and Goodman did not even discuss the number of investors in the Fund prior to Goodman's first $500,000 investment, thus belying plaintiff's claim that this information was critical to his investment decision; the evidence demonstrating that Goodman and Dohmen discussed the Fund's investment strategy so as to take a more active, short term trading approach and the evidence demonstrating that the May 14, 2012 email referred to the "long term" outlook that Goodman should take in evaluating the fund's performance rather than the conservative nature of the investments being made; and evidence indicating that the supposed misrepresentations were not a substantial cause of the Fund's decline in value, since the only substantial factor causing such decline was the poor performance of the Fund's underlying investments.

## Breach of Fiduciary Duty

20. As it survived summary judgment, Plaintiff's breach of fiduciary duty claim is based on the notion that Dohmen breach his duty of loyalty to Goodman by making the same allegedly misleading statements regarding outside investors and the Fund's "long term" vs. "short term" investment approach that form that basis for Plaintiff's fraud claims and by concealing the same information that Plaintiff contends gives rise to its fraudulent concealment claims. Further, Plaintiff contends that Dohmen breach his duty of loyalty to Goodman because it was "inherently uneconomic" for the Fund to do business with only $1.2 million in assets and with plaintiff as the sole outside investor.

21. With regard to the allegedly misleading statements, the same evidence refuting Plaintiff's fraud and fraudulent concealment claims refutes his breach of fiduciary duty claims. Specifically, some of the key evidence in opposition to these claims are defendant's testimony that he chose to invest in the Fund based solely on

his admiration for Defendant's investment newsletter and therefore did not actually rely on the allegedly false statement in deciding to invest; the fact that Dohmen and Goodman did not even discuss the number of investors in the Fund prior to Goodman's first $500,000 investment, thus belying plaintiff's claim that this information was critical to his investment decision; the evidence demonstrating that Goodman and Dohmen discussed the Fund's investment strategy so as to take a more active, short term trading approach and the evidence demonstrating that the May 14, 2012 email referred to the "long term" outlook that Goodman should take in evaluating the fund's performance rather than the conservative nature of the investments being made, the various disclosure made by Dohmen in which he made clear that there were not yet any outside investors in the Fund, the various discussions between Goodman and Dohmen wherein, both oral and written, wherein they discussed Dohmen's investment strategy and Goodman expressly approved such trading and the ongoing disclosures made by Dohmen relating to the Fund's investment performance.  Further, Goodman conflates "conservative" with "long term" – those terms are *not* synonymous, and as such, there was no deliberate concealment or misrepresentation.

22.   Finally, the Court is not persuaded that Dohmen breached his duty of loyalty to Goodman based on the claim that it was "uneconomic" for Dohmen to operate the hedge fund with only one outside investor and $1.2 million in assets. Goodman obtained other benefits from participating in the Croesus Fund, and was also given opportunities to exit the Croesus Fund but elected to stay invested. (Exhs. 120, 134, 137.)

Statute of Limitations

23.   Delaware applies a three-year statute of limitations to tort claims as well as claims for breach of fiduciary duty. *In re Verisign, Inc., Derivative Litigation*, 531 F.Supp.2d 1173, 1215 (N.D.Ca. 2007) (citing 10 Del. Ch. § 8106.) "The statute of limitations begins to run at the time that the cause of action accrues, which is

generally when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm." *In re Tyson Foods, Inc. Consol. Shareholder Litig.*, 919 A.2d 563, 584 (Del.Ch.2007).

24. Based on the filing date, any tort cause of action that accrued prior to January 5, 2012 is barred. Plaintiff was on notice of the fact that there were only two investors before that date, and his claims based on the November 20, 2011 email, in which defendant allegedly falsely represented that other individuals had agreed to invest in the Fund (Exh. 143), are barred.

25. Goodman attempted to show that, as required under the fraudulent concealment doctrine of tolling, defendant "knowingly acted to prevent plaintiff from learning facts or otherwise made misrepresentations intended to put [ ] plaintiff off the trail of inquiry." *Krahmer v. Christie's Inc.,* 911 A.2d 399, 407 (Del.Ch.2006). The Court is not convinced, and finds no such fraudulent intent, and the limitations period is not subject to tolling.

## CONCLUSION

For the foregoing reasons, this Court finds that Plaintiff failed to prove any of the causes of action brought to trial. Defendant is the prevailing party.

Respectfully submitted,

Dated: October 4, 2016          **HOLMES, TAYLOR & JONES LLP**

_____
Andrew B Holmes
*Attorneys for Defendant Bert Dohmen*