1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   ALBERT GOODMAN,                    )    No. CV 15-20 FFM
                                        )
12             Plaintiff,               )
                                        )
13        v.                            )    FINDINGS OF FACT AND
                                        )    CONCLUSIONS OF LAW
14   BERT DOHMEN,                       )
                                        )
15             Defendant.               )
     _____)
16

17        Plaintiff Albert Goodman ("plaintiff") filed the Complaint herein on January 5,

18   2015, bringing fraud, promissory fraud, and other claims arising from his investment

19   in a hedge fund managed by defendant Bert Dohmen ("defendant").  (Docket No. 1.)

20   The Court entered the final pre-trial conference order (the "FPTCO") on October 14,

21   2016.  (Docket No. 80.)  The matter was tried before the Court on November 1-4

22   2016, and on November 8, 2016.  Plaintiff filed a written closing argument ("Pltf.

23   Mem.") on December 10, 2016.  (Docket No. 95.)  Defendant filed his closing

24   argument ("Def. Mem.") on December 23, 2016.  (Docket No. 96.)  Plaintiff filed a

25   reply ("Pltf. Reply") on January 3, 2017.  (Docket No. 98.)

26        The matter thus stands submitted.  Under Rule 52 of the Federal Rules of Civil

27   Procedure, where an action has been tried on the facts without a jury, the court must

28   "find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P.

52(a); *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986). The court "is not required to base its findings on each and every fact presented at trial." *Id*. Rather, the court's findings must be "sufficient to indicate the factual basis for its ultimate conclusions," to aid appellate review. *Id.*

## I. FINDINGS OF FACT

A. <u>The parties</u>.

    (1) <u>Plaintiff</u>.

Plaintiff earned a bachelor's degree in 1974 and an MBA in 1979, both from the University of Southern California. (FPTCO at 2; 1TT 43:21-44:2, 45:3-8.) His completion of his MBA was delayed by major brain surgery. (1TT 44:3-45:5.) Since approximately 1982, plaintiff's primary source of income has been his investments. (FPTCO at 3.)

In 1999, plaintiff inherited $15 million. (1TT 47:23-48:1.) Plaintiff invested his inheritance with a broker who specialized in options. (1TT 48:2-12.) However, in connection with that broker's services, plaintiff lost $4 million in four days after September 11, 2001. (1TT 48:13-15.) As a result of this loss, plaintiff decided to avoid options and speculative investments. (1TT 48:16-19.)

Plaintiff reads various financial publications and has purchased financial instruments in a variety of sectors, including mining stocks, foreign currencies, and precious metals. (FPTCO at 3; 1TT 50:12-51:19, 52:11-53:4.) He has used several brokers over the decades and has traded on his own account. (1TT 49:1-50:22, 50:15-25.) However, prior to the events described herein, plaintiff had never invested in a hedge fund, and he did not know what a private placement memorandum was. (1TT 52:5-10.) He does not have a regular lawyer with whom he consults on investments and business matters. (1TT 52:2-4.)

/ / /

/ / /

2

1    (2)    Defendant.

2    For the past 40 years, defendant has engaged in researching, writing, and

3    publicizing newsletters, which he sells on a subscription basis to traders and

4    investors. (4TT 16:22-21:13; 7TT 37:14-39:10.) The newsletters provide

5    forecasting, analysis, and suggestions regarding the financial markets and world

6    economies. (4TT 16:22-21:13; 7TT 37:14-39:10.) Defendant is well-known in the

7    financial services industry and has been asked to speak at conferences and on

8    television programs. (4TT 39:16-25; 7TT 31:18-33:12.) Defendant engages in

9    trading on his own account. (7TT 40:10-16.)

10    Plaintiff became aware of defendant around 1982, through defendant's

11    newsletters. (1TT 54:10-19.) Plaintiff met defendant in 1999 in Hawaii. (1TT 57:4-

12    6.) Between 1999 and 2011, they had primarily a social relationship. (1TT 57:11-19;

13    4TT 23:17-24:11.) They visited each other a few times and went skiing together once

14    or twice. (1TT 57:11-15; 2TT 46:14-25; 4TT 24:12-20.) Plaintiff trusted defendant

15    and considered him a friend. (1TT 57:20-23.) Defendant considered plaintiff a friend

16    as well. (4TT 24:8-11.)

17    B.    Macro Wave and the Fund.

18    *Circa* 2010, defendant decided to set up a domestic hedge fund. (4TT 26:19-

19    27:7; 7RT 44:8-13.) Defendant had not previously formed or managed a hedge fund.

20    (FPTCO at 2.) Defendant formed the Croesus[1] Fund, LP (the "Fund") in 2011 as a

21    Delaware limited partnership. (*Id.*) He also formed Macro Wave Management, LLC

22    ("Macro Wave") to act as the Fund's general partner. (*Id.*) Macro Wave had

23    exclusive management and control of the Fund.[2] Defendant was the manager and sole

24

25    [1] Defendant chose the name "Croesus" because of its association with gold.

26    (7TT 44:19-24.)

27    [2] Around the fall of 2010, defendant engaged a law firm to provide services in

28    connection with (*inter alia*) forming Macro Wave. The firm charged defendant

3

member of Macro Wave. (*Id.*) No-one else worked for Macro Wave or managed the Fund. (4TT 30:3-5.)

Pursuant to the Fund's limited partnership agreement (the "Partnership Agreement"), Macro Wave received a monthly management fee from the Fund. (Ex. 145, § 5.06(a); 7TT 47:1-3.) The fee was 0.15% per month (1.8% per year) of each limited partner's capital account balance. (Ex. 145, § 5.06(a); 7TT 47:12-48:10.) In addition, Macro Wave was entitled to collect an incentive fee on an annual basis. The incentive fee was 18% of the realized and unrealized profits. (Ex. 145, § 3.02; 7TT 48:11-49:21.) Under the Partnership Agreement, investors in the Fund became limited partners therein. (Ex. 145, §§ 2.01-2.02.) The Fund had a 12-month lock-in period. (*Id.*, § 4.01(a).)

The Fund's private placement memorandum ("PPM") contained the following provision (the "Wide Latitude Provision"):

> The General Partner is not limited by the above discussion of the investment program. Further, *the investment program is a strategy as of the date of this Memorandum only. The General Partner has wide latitude to invest or trade the [Fund's] assets, to pursue any particular strategy or tactic, or to change the emphasis without obtaining the approval of the Limited Partners*. The investment program imposes no significant limits on the types of instruments in which the General Partner may take positions, the type of positions it may take, its ability to borrow money, or the concentration of investments. . . . In addition, the description of virtually every trading strategy must be qualified by the fact that trading approaches are continually changing, as are the markets invested in by the General Partner.

(Ex. 112 at 8 (emphasis added).)

---

$24,252 for its services. (3TT 15:21-16:9; Exs. 58-59.) After the Fund was established, the Fund reimbursed defendant, on an amortized basis, for all but $12,000 of that amount. (4TT 28:4-21.)

C.     Defendant solicits plaintiff's investment.

Defendant first spoke with plaintiff about the Fund *circa* May 2011, at a birthday party plaintiff organized for defendant.  (1TT 57:24-58:6.)  Defendant spoke only in vague terms, and plaintiff did not express interest in investing.  (1TT 59:14-18; 4TT 78:20-79:13.)

By the fall of 2011, plaintiff was living in Switzerland.  (1TT 58:7-9.)  On September 29, 2011, defendant emailed plaintiff[3] regarding investing in the Fund:

> Our fund is ready to go.
>
> Are you ready to come in?  The goal is to participate in just a few major trends:
>
> 1. *The coming China and Asia crisis*
> 2. *Precious metals related*
> 3. *Currencies primarily low leverage and ETFs*
> 4. *Income, fixed or equity, to obtain appreciation or income, or both.*
>
> *At the beginning, we will only admit people I know personally*.
>
> If you would like to see the docs, I can email them.  Lots of pages.  Lots of boilerplate.

(Ex. 6 (emphasis added).)  Plaintiff replied:  "*Yes, I would like to be a part of this investment fund.  I guess you could drop the perspectus [sic] in the mail, [e]ven though I would just give it a quick scan.*"  (*Id.* (emphasis added).)  Plaintiff meant this statement to be a strong indication of interest rather than a commitment to investing.  (1TT 61:10-15.)

/ / /

/ / /

---

[3]  Unless otherwise noted, the parties' communications took place by email.

5

The parties discussed the Fund again on October 15, 2011. As relevant, defendant stated:

> My New Hedge Fund: We just got it completed.
> Everything ready to go and to accept investors. Would you like to participate in some way.
>
> . . . .
>
> At the start you can get in with $500K, later $1 mio.
>
> The primary goal is to take advantage of "macro trends," at this time precious metals related, long/short Asia related, currencies (very low leverage), and income related.

(Ex. 7.) Plaintiff replied that he was "ready to go." (*Id.*) Defendant responded: "Attached is the voluminous PP*P*. Most of it is the normal boilerplate. . . . Also attached is the subscription agmt." (*Id.* (emphasis added).)

Plaintiff did not know what defendant meant by "PPP." (1TT 66:21-24.) In fact, defendant was referring to the Fund's PP*M*. (4TT 85:6-13.) The Fund's subscription agreement (the "Subscription Agreement") was attached to the email, but the PPM apparently was not.[4]

/ / /

---

[4] Plaintiff indicated in his signed Subscription Agreement that he had received and read the PPM. (Ex. 111 at 12 (each page initialed and last page signed by plaintiff).) However, the PPM is not listed as an attachment to the October 15th email. (*Compare* Ex. 7 (attaching "Croesus Fund, L.P. - Individual Subscription Booklet 10-6-11.pdf") with Ex. 163 (referring to "Croesus Fund, L.P. - Individual Subscription Booklet (September 2011).pdf" *and* "Croesus Fund, L.P. - Private Placement Memorandum (September 2011).pdf").) Plaintiff testified that he never received the PPM (2TT 60:13-22), and there is no numbered copy of the PPM in the record (*see generally* Exs.). However, given plaintiff's initialing and signing the confirmation that he had received and read the PPM, the Court finds that plaintiff is estopped from asserting that he never received the PPM.

Plaintiff discussed the Fund with defendant *via* telephone two or three times before he invested. (1TT 69:7-10.) Plaintiff testified that in these calls, defendant told him that 10 to 12 investors had committed to invest. (1TT 70:5-23.) The Court finds that plaintiff's recollection is mistaken as to any representation made by defendant during these telephone conversations about 10 or 12 investors being committed to invest.[5]

D.    Plaintiff signs the Subscription Agreement and invests in the Fund.

Sometime in mid-October, plaintiff signed the Subscription Agreement and sent it to defendant. (2TT 55:18-56:21; *see* Ex. 111 at 6.) On November 1, 2011, plaintiff asked if the Fund was "still going to happen," as he had not heard back from defendant. (Ex. 8.) Defendant responded the same day, saying he had not received the application. Defendant also stated, "*We have not announced the fund yet. Haven't had time to speak to more than two people about it so far*. However, we will start contacting some of my good friends soon. *The fund is up and running now*, *with some of my own money*. Just did the first trades today." (*Id*. (emphasis added).) That same day, defendant had invested $200,000 in the Fund. (FPTCO at 2.)

On November 6, 2011, defendant advised plaintiff that he had received the application. He also stated, "there may be several other people coming in now . . . ." (Ex. 9.) Defendant countersigned the application form on November 7, 2011. (Ex.

/ / /

---

[5]  Plaintiff had previously testified in his deposition only that defendant had stated that other investors *were ready to invest.* (2TT 97:14-24.) Further, plaintiff's deposition testimony did not mention any specific number of potential investors. (2TT 50:7-52:4.) The Court notes that on November 1, after plaintiff had sent in his application but before he invested any money, defendant essentially told him that *defendant* was the only investor so far. (Ex. 8; *see* discussion in the following paragraph.) The record does not indicate that plaintiff made any response to this information. Under these circumstances, the Court finds that plaintiff is mistaken with respect to this portion of the telephone conversations.

111 at 16.)  On November 14, 2011, plaintiff invested $500,000 in the Fund.
(FPTCO at 2.)

Plaintiff decided to invest in the Fund for several reasons.  First, as a result of
reading defendant's newsletters, plaintiff had confidence in defendant's investing
abilities and believed defendant would be able to make money with the Fund.  (1TT
74:9-14, 75:23-76:5.)  Second, plaintiff thought that defendant had already obtained
other individuals who had committed to invest in the Fund.  (2TT 97:19-24.)  Third,
plaintiff believed that defendant was going to invest his own money in the Fund.
(1TT 76:6-12.)  Fourth, plaintiff liked the Fund's long-term approach to investing in
gold and other primary areas, as described by defendant.  (1TT 65:8-21.)

On November 20, 2011, plaintiff asked defendant, "How many investors do
you have [in the Fund]?  Have you started the investments?" (Ex. 10.)  Plaintiff
indicated that he had an additional $500,000 to invest.  (*Id.*)  On the same day,
defendant responded:

> We have not yet officially announced the start of the fund.
> You are one of the few who knows it exists.  *There are*
> *several other close friends I told about the fund that are*
> *now liquidating some assets in order to participate*.

(*Id.* (emphasis added).)  Plaintiff understood the reference to friends "liquidating
some assets" to mean that more investors were coming in, which plaintiff found very
reassuring.  (1TT 82:23-83:4.)  In fact, no friends of defendants were liquidating
assets to invest in the Fund – a fact of which defendant was well aware.  (*See*
discussion, *infra*.)

Defendant continued:

> My aim is to start slowly and carefully.  The tortoise wins
> the race.  *Soon we will make an announcement to a wider*
> *group of investors who have indicated interest over the past*
> *few years in some kind of a managed money program*. . . .

(Ex. 10 (emphasis added).)

8

Plaintiff understood the "wider group of investors" to be comprised of defendant's subscribers. Plaintiff assumed that defendants' subscribers had been requesting that he start the Fund. (1TT 83:5-13.)

Defendant further stated:

> *I suggest that once your [*sic*] are in the fund, take the long term approach*. The markets will be very volatile and the month to month swings will be as well. *Our goals is to capture the 'Macro Wave*,' and not be motivated by emotions.

(Ex. 10 (emphasis added).) Plaintiff believed that by "long term," defendant meant that the Fund would be a four- or five-year commitment. (1TT 83:14-18.) Defendant understood the term "long term" to mean "several years." (4TT 56:20-57:8.)

On November 25, 2011, defendant asked plaintiff, "Are you planning to put in the additional funds before the end of November? If so, let me know in advance." (Ex. 11.) On November 26, 2011, plaintiff responded, "So sorry to be so pushy about those questions, but just want to double check and have an idea as to how big [the Fund] will be." (*Id.*) Defendant replied:

> Re the question of 'how big it will be,' I can only say that it will probably not be very big, depending on how it is defined. . . . *Until we get a good track record, I only want investors I know, or who have been referred by friends, and that I have spoken to.* They will all be 'accredited investors.' *My first goal is to get to 20-30 million. If the fund does well, perhaps we can get to 100 mio by end of 2012.* Those are my parameters right now, which of course can always change depending on conditions. *We haven't even announced the fund yet, officially. Only a few of my good friends know about it.*

(*Id.* (emphasis added).) On November 28, 2011, plaintiff thanked defendant for the information about the Fund's potential size. He assured defendant that his second $500,000 investment would arrive shortly. (Ex. 12.)

9

On that same day, defendant again emphasized the Fund's long-term strategy. He assured plaintiff that the Fund would not engage in the riskier, mostly short-term trading strategy defendant employed for his own money:

> Re my investments, you know that *for the past 40 years I have been trading my own money, mostly on a short term basis. But I will not do that for the fund as it has a longer term strategy. In other words, it is designed to be much more conservative than my own trading. For myself, I take greater risks*.

(Ex. 12 (emphasis added).)

Plaintiff interpreted this statement as an acknowledgment that defendant had not invested any of his own money in the Fund. As a result, plaintiff wrote defendant that he had changed his mind and did not want to invest the second $500,000. (Ex. 13.) In response, defendant reminded plaintiff that he had invested $200,000 of his own money in the Fund. He also stated that his plan was to increase that investment after the first of the year. (*Id.*)

On December 9, 2011, plaintiff advised defendant that his agent already had sent in the second $500,000. Plaintiff again inquired about the size of the Fund: "[H]ow big and how many investors[?]" (Ex. 15.) On December 12, 2011, plaintiff sent defendant another email: "Just trying to check on the fund and the other half million that I sent in last week. How big and how many are we??" (Ex. 16.) On December 13, 2011, defendant responded:

> I think I replied that the other half came and was invested effective immediately. The Administrator made an exception and made the mid-month investment start possible. That's because so far we are very small.
>
> *We have not done any contacting of potential subscribers yet*. First of all we are so busy with year-end stuff, and second I believe that the big opportunities will start next

/ / /

10

year. *Personal friends that have expressed interest are now reviewing the documents.*[6]

(*Id.* (emphasis added).)

Plaintiff did not understand what defendant meant by "very small," except that the Fund was "probably smaller than [plaintiff] had anticipated." (1TT 94:3-6.) He interpreted the email to mean that defendant was focusing on his personal friends and had not contacted subscribers to his newsletter. (1TT 94:7-13.) Plaintiff still believed that defendant's friends were going to invest in the Fund. (1TT 94:14-21.) However, defendant's last sentence was knowingly false. No one who had expressed interest was reviewing Fund documents at that time. (*See* discussion, *infra*.)

Defendant further stated:

> In regard to your investment, please don't look at week to week, or month to month, moves. *This is a long term approach*. . . . The market volatility is the highest in history. The only way to handle that is to ignore it and go with the powerful, underlying fundamentals.

(Pltf. Ex. 16 (emphasis added).) On December 14, 2011, plaintiff's additional $500,000 (that he had sent in during the week of December 5, 2011) was invested in the Fund. (FPTCO at 2.)

On December 21, 2011, defendant stated:

> In [the Fund], the approach isn't short term anyway . . . . Most hedge funds today are very short term oriented. I don't think that will work over the longer term. Of course,

---

[6] As implied in the email, defendant had by this time contacted people he knew personally regarding the Fund. (*See* discussion, *infra*.) Plaintiff testified that he understood defendant to be distinguishing between "personal friends" (who had been contacted) and "subscribers" to the newsletter (who had not yet been contacted). The use of the word "potential" before "subscribers" is not entirely consistent with plaintiff's understanding (*i.e.*, newsletter subscribers were actual, not potential, newsletter subscribers).

> not doing short term trading means that at times, there will
> be declines in the portfolio.  But over the past 35 years, I
> have gotten the major trends right, and that is what counts.

(Pltf. Ex. 18 (emphasis added).)

E.    <u>Defendant's efforts to secure other investors</u>.

Other than plaintiff, defendant had contacts with only five potential investors regarding the Fund.  In April of 2011, defendant emailed a version of the Fund's PPM to John Anderson, a friend and "big investor."  (Ex. 176; 7TT 94:22-97:4.)  Defendant did not follow up with him, and Anderson did not invest in the Fund.  (7TT 99:15-22.)  Defendant sent the PPM to another friend, Peter Liu, who evidently did not respond to defendant's email or invest in the Fund.  (*See* 7TT 100:16-25.)  On October 19, 2011, Liu's son Edward stated that he had seen his father's PPM.  He asked defendant if he could invest in the Fund with only $250,000.  Defendant rejected Edward, as he did not qualify as an "accredited investor."  (Ex. 172; 7TT 100:8-101:12.)

On November 15, 2011, defendant sent a summary of the Fund to another friend, Byron Reyes, and to a longtime newsletter subscriber, Andrew Cooper.  (Exs. 165, 166.)  Defendant emailed Cooper again on December 6th.  (Ex. 167.)  Neither Reyes nor Cooper invested in the Fund.  In fact, neither Reyes, Cooper, nor Anderson gave defendant any indication that they were interested in investing in the Fund.  (5TT 33:13-35:2; 7TT 101:16-103:2.)  The last indication in the record that defendant attempted to contact a potential investor about the Fund is a December 16, 2011 email to Bill Atherton.  (Exhibit 158.)  The record contains no indication of a response from Mr. Atherton.  No one other than plaintiff committed to investing in the Fund.  And as defendant admitted, no one ever stated that he was liquidating assets to participate in the Fund.  (5TT 5:9-7:15.)

/ / /

/ / /

12

F.    <u>Plaintiff remains the only outside investor</u>.

Defendant did not make any further efforts to bring in other investors after his email to Bill Atherton on December 16, 2011. (Ex. 158.) The Fund started losing money almost immediately after it started trading, and defendant thought that chances were small anyone else would invest unless it started making a profit. (4TT 76:17-77:15; 103:4-25; 5TT 17:18-18:6, 47:17-20.)

On May 14, 2012, defendant informed plaintiff, for the first time, that there were only two investors in the Fund and defendant was not accepting new ones.[7] (Exs. 23 and 24; 2TT 7:15-24.) This disclosure came as a shock to plaintiff. (2TT 7:21-8:1.) He expressed concern and confusion about the Fund's size ("When you say two investors, do you mean you and me?") and complained about the lack of regular statements. (Ex. 23; 2TT 8:4-9:22.)

In response, defendant offered plaintiff an early exit from the Fund at the end of June of 2012. (Ex. 23.) However, he advised plaintiff against taking that step. Defendant stated, "As you know, *this is supposed to be a long term investment* for a small part of your overall investments . . . ." (*Id.* (emphasis added).) Defendant asserted that the PPM required only annual reports, but offered to send plaintiff quarterly position statements. (Ex. 25.) Plaintiff agreed to this arrangement and asked for the "April statement" (*id.*), by which he meant the statement for the quarter ending March 31st (2TT 11:25-12:6). Plaintiff did not withdraw his investment from the Fund. (2TT 72:1-13.)

_____

[7] Defendant admitted that this was the first time he told plaintiff he was not accepting new investors. (5TT 56:20-22.) He claimed, however, that in an earlier phone conversation in 2012, he told plaintiff that he and plaintiff were the only investors. (5TT 56:6-19.) Given plaintiff's written response (as shown in Exhibits 23 and 24), plaintiff's testimony, and defendant's demeanor while testifying, the Court finds that defendant did not inform plaintiff that the Fund only had two investors until May 14, 2012.

G.    Defendant's subsequent representations regarding the Fund's investment strategy.

On June 8, 2012, defendant sent plaintiff a portfolio analysis report and a "letter to investors" from Macro Wave.  (Exs. 28, 29.)  The report covered the period from November 2011 through May 2012.[8]  (Ex. 28; 6TT 26:6-16.)  The report stated that the Fund had an ending net asset value ("NAV") of $918,081.61 and a cumulative return of -23.98%.  (Ex. 28.)  However, in the cover email, defendant emphasized the Fund's very recent performance and implied that it resulted from the strategy he had previously described to plaintiff:  "May performance was excellent (up about 24% for the month) *and shows what can happen when our scenario starts working out*."  (Ex. 28 (emphasis added).)

The Macro Wave letter overtly emphasized the Fund's long-term strategy.  *Inter alia*, defendant asserted that the Fund was "designed to protect and benefit from the *long term trends* we foresee over the next several years in several areas."  (Ex. 29 (emphasis added).)  "*[U]sing a very short term strategy for the swings in the precious metals is not possible*."  (*Id.* (emphasis added).)  Defendant further stated, "*The primary goal of the [F]und is to be a precious metals related investment for the long term.  Short term trading is not the goal* although market conditions may require such trading occasionally."  (*Id.* (emphasis in original).)

At some point, defendant started to increase the Fund's short holdings and eventually changed to a less focused, shorter-term, riskier trading strategy altogether. (*See* discussion, *infra*.)  By his own admission, defendant changed the investment strategy around the third quarter of 2012 but did not inform plaintiff prior to making this change.  (6TT 94:9-12.)

_____

[8]  Defendant was able to generate portfolio analysis reports from the Fund's brokers, Interactive Brokers, by logging onto the company's website and configuring the desired parameters, including the time period covered in the report.  (4TT 45:11-16; 6TT 23:5-25.)

Plaintiff understood from the statements in the June 8th letter and report that the Fund would be making "long-term" investments in major trends. (2TT 76:19-77:5.) Plaintiff believed that because it had a long-term strategy, the Fund would be less risky than a fund with a short-term strategy, because it had to be able to ride out any downturns in the market. (2TT 77:6-18.)

Notwithstanding this general attitude, plaintiff was aware that defendant was engaging in short term trades and short-selling to counter dips in gold and encouraged defendant to continue doing so. After reviewing the June 8th report, plaintiff told defendant, "Yes, you said that [the Fund] would be primarily for long term investments and mostly in gold. *However, you do so well with the short term and short side to the market that I hope that you continue with the successful strategies of May*." (Ex. 155; 2TT 80:6-20 (emphasis added).) Plaintiff assumed that defendant was using the "comparatively short term" strategies described in defendant's "Smarte Trader" newsletter, and would be selling short on occasion for short periods of time.[9] (2TT 80:16-81:11, 88:6-14.) Plaintiff testified that he assumed that such strategies would not comprise more than 10% to 12% of the Fund's investment activity. (2TT 78:12-79: 18, 81:12-25.) Plaintiff's testimony as to this assumption was not convincing.[10]

---

[9] In broad terms, the parties had the same understanding of what they variously referred to as "short-term trading," "trading strategies," and/or "trading in other positions": hedging against a decline in the Fund's long-term positions by, *inter alia*, short-selling other stocks. (*See* 2TT 82:11-23; 7TT 6:12-78:9.) However, they had differing understandings of the mechanics of short-selling. Plaintiff described it as "betting that the stock is going to go down," but he did not believe that it required borrowed money, and he was adamant that there was "no leverage in it." (2TT 88:15-89:1.) By contrast, defendant was aware that "[i]n order to sell short you have to go on margin." (6TT 95:1; *see* "Regulation T," 12 C.F.R. §§ 220.1 *et seq.*)

[10] Plaintiff testified that he deduced that percentage from the fact that stocks and bonds comprised one of four areas of investment in the Fund. Plaintiff reasoned that investing in stocks would therefore comprise half of one quarter (*i.e.*, 12.5%) of

Plaintiff and defendant discussed the Fund's performance by email in June and July. (Exs. 32-34, 155.) On June 28th, defendant reported that the Fund had used "*trading strategies* to hedge against the weakness of the precious metals sector during June. So far that has worked out." (Ex. 155 (emphasis added).) Plaintiff believed that defendant was "shorting it at times to take advantage of the some [*sic*] dips in the gold." (2TT 82:15-21.)

On June 29th, defendant sent plaintiff a portfolio analysis report for the first quarter of 2012, which had ended on March 31st. (Ex. 124.) Plaintiff subsequently requested a report for the second quarter, which had ended on June 30th. On July 27th, defendant reaffirmed the weakness in the Fund's long positions and the strategy for countering such weakness. Defendant told plaintiff that precious metal stocks were "suffering" and the Fund had "made some nice profits *on the short side* in other stocks and actually ha[d] done well." (Ex. 33 (emphasis added).) Defendant promised to send "the July report" when the month was over, but he did not do so. (Ex. 33; 2TT 23:21-24:1.)

On August 28th, plaintiff complained about the lack of a second quarter report. He asked to have his investment transferred to a regular stock account he owned. (Ex. 33; 2TT 24:2-18.) That same day, defendant sent plaintiff a portfolio analysis report for April 1st through August 27th. The report showed a cumulative return of 12.01% and an ending NAV of $977,697.19. (Ex. 34.) In the cover email, defendant asserted, "We were able to reduce the effect of the significant decline in the mining complex *through other positions*." (Ex. 34 (emphasis added).)

/ / /

_____

the Fund's investment activity. (2TT 78:23-79:18.) Plaintiff did not explain what made him think that the Fund would be equally distributed across the four areas of investments or that the stocks and bonds category would be split equally. Plaintiff also did not reveal why he thought that short-selling in such a small portion of the Fund would have such a large impact on the Fund's overall NAV.

Two days after plaintiff's request, defendant stated that although he was willing to liquidate plaintiff's investment, it would be "a bad decision" on plaintiff's part to do so. (Ex. 134.) He reported that the Fund was up about 46% since the low in early May. (*Id.*) Defendant stated, *inter alia*, "[T]he big decline in mining stocks, which are mostly our long term positions, was countered pretty well with *trading in other positions*." (*Id.* (emphasis added).) Plaintiff testified that he still did not understand defendant to mean that he was using more than a small part of the portfolio for short-term trading. (2TT 84:6-15.)

Defendant sent plaintiff a report and Macro Wave letter on November 5th. (Ex. 37.) The report covered the second and third quarters of 2012 and showed a cumulative return of -6.69% and an ending NAV of $821,962. (*Id.*) In the letter, defendant stated:

> We were doing nicely until the end of August. But then the markets rallied sharply into mid-September, hurting our short positions. That was followed by a swift market downturn. . . .
>
> [M]uch of our short exposure has been in basic materials because of the goals of the fund, i.e., to capitalize from an expected China recession. As you know, the Chinese economy is deteriorating . . . .
> Taking the longer view, [the fact that the Fed's greater than expected QE3 stimulus] couldn't produce more than a big one day rally . . . suggests severe market weakness. . . .
>
> With the European crisis, and the China slowdown, and the US election, the cross currents have been incredible. We are not wedded to any market scenario. *If the facts change, we will change our strategy as well*. . . .
>
> *We will reevaluate the situation at the end of the current quarter and discuss the future with our investors [sic] at that time.*

(*Id.* (emphasis added).)

17

Defendant did not state that he had, in fact, already made a significant change to the Fund's trading strategy. (*See* discussion, *infra*.) Furthermore, neither the letter nor the report revealed that as of November 5th, the NAV was down to about $500,000, having suffered a 29.55% loss in October alone. (Ex. 64 at 37.) Plaintiff did not see anything in the letter or report that led him to understand that there had been a fundamental change in the Fund's investment strategy.[11] (2TT 26:15-20, 102:9-18.)

The Fund performed very poorly in the fourth quarter of 2012. The NAV had dropped to $357,141 by December 31, 2012. (Ex. 41 at 3.) As of January 25, 2013, defendant had not sent plaintiff a report for the fourth quarter of 2012 or an annual report for 2012. (2TT 27:15-22.)

On January 25, 2013, defendant emailed plaintiff, but did not mention the Fund's fourth quarter 2012 performance. Instead, he wrote:

> We are participating in the January rally with the high yielding stocks. We took profits on these over the past several days. The **precious metals** area hasn't been easy. **We reduced the position to only one at the present time in order to be safe.** That turned out to be a good move. I

/ / /

---

[11] The Court notes that the reports and letters defendant sent to plaintiff varied widely in the data presented. For example, the June 8th letter compared the Fund's performance to that of the Market Vectors Gold Miners ETF (the "GDX"). In the letter, defendant asserted that the Fund's NAV tracked the GDX's performance "very closely, which is logical because that's where the major concentration is." (Ex. 29.) By contrast, defendant's June 29th report used the S&P 500 Index as the performance "benchmark" (Ex. 124), and the November 5th letter used the Dow Jones Basic Materials Index to illustrate the Fund's "short exposure" (Ex. 37). As another example, the August 28th report included the Fund's allocation by sector (Ex. 34), but the November 8th report did not (Ex. 37). From a layperson's perspective, the inconsistent use of data would obscure whether and to what degree the Fund's activities changed over time.

> am confident that this year will offer us some great
> opportunities. . . .
> Therefore, at this time **we are taking a more active**
> **investing approach until the markets change back to**
> **more normal, rather than taking the 'long term hold.'**
> Please let me know immediately if you are not in favor of
> that.

(Ex. 38 (emphasis in original).)  Defendant conceded that to be more accurate, he should have stated, "[W]e started taking a more active trading approach when the market conditions required it last year."  (6TT 89:25-90:13.)  He further testified that he was not seeking plaintiff's approval for the changed trading strategy, because plaintiff's approval was not necessary.  If plaintiff was not in favor of the change, he would have offered to liquidate plaintiff.  (6TT 89:15-24.)

For his part, plaintiff believed defendant to be describing the Fund's present and future strategy rather than a change that had occurred in the past.  (2TT 102:19-103:8.)  Plaintiff responded, "Your newsletters have . . . continued to be my favorite, and I am glad that you have been using your own advice in our fund."  (Ex. 38.)  Plaintiff did not withdraw his money from the Fund.

H.    Defendant changes the Fund's investment strategy.

Although some short-selling was part of defendant's trading strategy from the beginning, defendant started increasing the Fund's short positions to counter dips in the gold market.  This increase in short sales led at some point to a significant change in the Fund's investment strategy.  As explained by plaintiff's expert, rather than engaging in occasional buying and selling as a means of fine-tuning a core macrowave position, defendant progressively increased the volume of trading and the degree of leverage used.  (3TT 27:22-29:5.)  What is unclear is the precise time that these changes were made.

/ / /

/ / /

Plaintiff's expert testified defendant changed the Fund's strategy beginning in late May or early June. (3TT 26:24-27:4.)[12] He also testified that "incredible [trading] activity picked up" after August 2012. (3TT 31:8-9.) Defendant testified that he "made a conscious decision at some time in . . . the third quarter of 2012 that [he was] going to engage in a more active trading approach." (6TT 93:24-94:7.)

Plaintiff made very little effort to pinpoint a date for the change in trading approach. Plaintiff's Exhibit 68 contains two tables that at once shed some light on the question and further blur the time line. The first table demonstrates that the months of September, October, November and December 2012 saw a very high volume of trading. (3TT 28:8-20.)

| Month | Starting Assets | Bought | Sold | Transactions/Assets |
|---|---|---|---|---|
| September | $999,466 | $2,653,405 | $1,145,725 | 380% |
| October | $821,962 | $1,348,219 | $1,465,818 | 343% |
| November | $579,089 | $5,009,043 | $4,966,431 | 1742% |
| December | $527,382 | $3,018,724 | $1,585,010 | 881% |

(Ex. 68, ¶ 31; 3TT 27:19-28:20.)

Plaintiff's expert testified that the foregoing figures for November illustrate that purchases and sales on an average trading day almost equaled the whole value of the account. (3TT 28:17-20.) He further testified that he looked at the individual stocks that were traded during this period and found that "at least half and maybe more had nothing to do with China or gold or anything else [in the four defined sectors that the Fund ostensibly was investing in]." (*Id*. at 28:21-24.) The table starts in September, presumably because the "incredible" increase in trading activity

/ / /

---

[12] Plaintiff's expert testified that "the shift really started to occur - - and the period that I analyzed in most depth was after late May, early June of 2012 . . . ." (*Id*.)

commenced after August.  These figures appear consistent with defendant's testimony that he took a more active trading approach "sometime in the third quarter" of 2012.

The second table demonstrates that, in the second and third quarters of 2012, the Fund moved to greater emphasis on short positions with wide swings from net long to net short:[13]

| Month | Long v. (Short) |
| --- | --- |
| April 2012 | $819,332 |
| May 2012 | $444,380 |
| June 2012 | ($10,130) |
| July 2012 | $435,929 |
| August 2012 | ($1,619,916) |
| September 2012 | ($287,340) |

(Ex. 68, ¶ 52; 3TT 38:14-40:4.)

Here, however, the largest swing occurs in August, before the increase in trading activity.  Further, no figures are provided for October, November, or December.  Apparently, the move toward more rapid turnover of the account did not entirely coincide with the increase in short positions.

Plaintiff's expert further testified that the Fund saw an increase in margin interest charges in 2012, with a noticeable increase in May 2012 and a dramatic jump in June 2012.  (*See* Ex. 60.)  Defendant testified that short positions are always on margin.[14]  (6TT 94:22-95:1.)  There was no testimony that pinpointed how much, if

/ / /

---

[13]  If the value of stocks owned long is the same as the value of stocks sold short, a portfolio is net neutral.  If the value of stocks owned long is less than the value of stocks sold short, the portfolio is net short.  If the reverse is true, the portfolio is net long.  (3TT 39:2-19.)

[14]  By definition, a short sale involves the sale of a borrowed security.  Thus, at some point in the future the seller has to pay for the security at its then market price.

any, margin was used to leverage a long position.[15]  The May interest charges may or may not have been primarily or entirely associated with an increase in short selling. In any event, the trading in May coincided with a recovery of the Fund from $741,698 at the end of April to $918,081 at the end of May.  (Ex. 28 at 5.)  The GDX appeared to be in decline during this period.  (Ex. 72.)  In June the Fund more or less held steady until June 26, when it started dropping precipitously until mid July.  (Ex. 34 at 4.)  By the end of August, the month in which defendant engaged in his most robust short selling (according to the table, *supra*), the Fund had recovered to $999,466. (Ex. 37 at 5.)

The short positions took somewhat of a beating in September (falling 17.76% and ending at $821,962), during which time the GDX rose.  (Ex. 37 at 5 and Ex. 64, page 4 of report attached to November 5, 2012 letter; *compare* Ex. 72.)  The GDX then went into a steep decline from October 2012 to January 2014.  (Ex. 72.)  The Fund experienced a massive decline from September through December 2012 (ending at $357,141).[16]  (Ex. 64, page 4 of report attached to November 5, 2012 letter.)

Thus, seemingly, margin trading (possibly for short sales) increased in May, June and August and trading activity picked up from September to December. Apparently, defendant's change in strategy evolved over a period of several months, as he fought to generate positive returns.  The relatively successful results in May, July and August were reversed and then some by the unsuccessful results in

---

[15]  Plaintiff's expert testified that, because of the Fund's short sales, it was impossible for him to figure out what amount of margin was used to purchase securities.  (3TT 32:11-12, 34:9-35:10 ("[Only] a special class of people . . . who never come out of the dark room . . . know how to do these calculations.").)

[16]  Plaintiff's expert referred to a jump in margin violation warnings between October 17th and November 5th as further demonstrating how risky defendant's newly adopted strategy was.  (Ex. 63.)  The Court notes that the drastic nature of the drop in the Fund's NAV during this period nearly assured the Fund would encounter margin problems to the extent it held a not insignificant amount of margin.

September through December. The steep drop in the Fund's NAV from September through December coincided both with a severe drop in the GDX index and the increased trading activity described in the foregoing table.

I.      Plaintiff's losses.

      (1)      The decline in the Fund's value.

The NAV of the Fund on June 30, 2012 was $804,021.26. (Ex. 130 at 5.) At the end of January 2013, the Fund had an NAV of approximately $368,000. (*See* Ex. 64.)

By the end of March 2014, the Fund's NAV was down to approximately $235,317.57. (Ex. 48 at 4.) Defendant stopped trading *circa* June 2014. (Ex. 49.) By July 24, 2014, the Fund had approximately $100,000 in assets. (Ex. 51; 2TT 33:7-34:5; 7TT 11:19-13:18.) Zero percent of plaintiff's $1 million investment has been returned to him. (2TT 34:6-10.) By the time of trial, the Fund had approximately $2,000 in assets, as defendant had used the Fund's remaining assets to pay part of the attorney's fees incurred in defending plaintiff's suit. (7TT 19:19-20:10.)

In plaintiff's expert's opinion, plaintiff's losses from the decline in the Fund's value resulted from defendant's "reckless management of the Fund " which "violated the investment objectives and philosophy as outlined in the PPM and [defendant's] early communications with [plaintiff]." (*See* discussion, *supra*; *see* Ex. 68, ¶ 55.)

      (2)      Expenses and fees.

In addition to incurring Macro Wave's 1.8% management fee, plaintiff bore 83% of the ongoing "administrative fees" and "organizational costs" charged to the Fund by Fund Associates. (3TT 15:17-18:21, 22:1-5.) By December 2012, plaintiff had incurred $20,750.03 in ongoing expenses, which included defendant's management fees ($13,802.89) and Fund Associates' fees ($2,578.31) and costs ($4,368.83). In addition, at some point, plaintiff incurred approximately $10,000 of the Fund's startup costs (*i.e.*, 83% of approximately $12,000). (3TT 15:6-19:25; Ex. 68, ¶¶ 12, 13.)

Fund Associates deducted the ongoing fees and expenses each month from plaintiff's capital account, starting with the month of December 2011. (Ex. 60 at FA 01179; *see* Ex. 68, ¶ 13.) However, plaintiff has not pointed to evidence showing *when* he was charged his portion of the Fund's startup costs. (*See* Ex. 68, ¶ 12.) The evidence indicates that the costs were recouped from the Fund on an amortized basis (*see* n.2, *supra*), but the amortization rate and period are not clear. Nor is it clear whether Fund Associates separated the amortized startup costs from the ongoing expenses charged to plaintiff.

(3)     The higher "hurdle rate."

The fact that plaintiff was the only outside investor in the Fund increased the "hurdle rate" – *i.e.*, the minimum return the Fund had to make in order for plaintiff to realize a profit. In plaintiff's case, the hurdle rate was approximately 5%. (3TT 22:1-21, 60:14-61:2; Ex. 68, ¶¶ 12-13.) That hurdle rate made it "more difficult," but "[n]ot impossible," for plaintiff to stay in the Fund and make money. (3TT 60:14-21.) Had plaintiff invested his money in a managed brokerage account, he would have been charged a fee of approximately 1%, which would have covered fees, commissions, and accounting costs. (3TT 21:17-25.)

## II.  CONCLUSIONS OF LAW

A.     Fraud and securities fraud.

Plaintiff contends that defendant committed fraud by misrepresentation and securities fraud by misrepresenting to plaintiff that other people would be investing in the Fund. (FPTCO at 4.) He contends that defendant committed fraud by concealment by concealing the lack of other investors from plaintiff. *Id.* Plaintiff also contends that defendant committed fraud and securities fraud by misrepresenting that the Fund was a long term investment and by concealing from plaintiff the Fund's active investment strategy.

/ / /

(1)    Applicable law.

Under Delaware law,[17] a plaintiff claiming fraud by misrepresentation must prove the following:  (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.  FPTCO at 5; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).  A plaintiff claiming fraud by concealment must show (1) the deliberate concealment of material facts, or silence in the face of a duty to speak, and factors (2) through (5), above.  FPTCO at 6; *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003); *Metro Comm'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004).

Section 78j, subsection (b), of title 15 of the United States Code (referred to as "Section 10(b)(5)") makes it unlawful for any person to use any "manipulative or deceptive device" in connection with the purchase or sale of securities.  A Section 10(b)(5) plaintiff must establish the following:  (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.  FPTCO at 6; *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).[18]

---

[17]  The Subscription Agreement contains a Delaware choice-of-law provision, and, as the Court found in its order on defendant's motion for summary judgment (the "MSJ Order"), the parties do not dispute that Delaware law applies to plaintiff's claims.  (Docket No. 55 at 11 n.4.)

[18]  A fact or matter is "material" if a reasonable person would consider it important in determining his choice of action in the transaction in question.  *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 813 (Del. Ch. 2014).  The parties do not appear to dispute materiality.

25

(2)     <u>The number of investors</u>.

      (a)     <u>Falsity and omission</u>.

Plaintiff bases his misrepresentation claims on (1) the telephone conversations in which defendant stated that other individuals had committed to investing in the Fund; and (2) the November 20, 2011 email, in which defendant stated that "several other close friends" were "now liquidating assets in order to participate." (FPTCO at 7, 11, 15.) As detailed above, plaintiff failed to prove by a preponderance of the evidence that defendant stated that other individuals had committed to investing in the Fund during the referenced telephone conversations.

*(i) First $500,000 investment*

Plaintiff made his initial $500,000 investment on November 14, 2011. Defendant's statement as to other individuals liquidating assets to invest was knowingly untrue. However, that statement was not made until November 20, 2011, after plaintiff had invested his initial $500,000. Moreover, defendant essentially told plaintiff on November 1, 2011, (before plaintiff had invested his money) that defendant was the only investor as of that point. (Ex. 8.) On November 5, 2011, defendant stated that "there *may be* other investors about to come in." (Ex. 9 (emphasis added).) Defendant may have been trying to generate enthusiasm for plaintiff to commit his investment, but plaintiff has failed to prove by a preponderance of the evidence that the statement was knowingly untrue. Certainly at that time, defendant was beginning to contact acquaintances who might have been interested in investing. It was not until late December (at the earliest) that defendant gave up trying to secure additional investors.

As of the date of plaintiff's first $500,000 investment, defendant had not made any knowingly false statements, or concealed any material facts from plaintiff. Therefore, plaintiff's fraud and securities fraud claims as to his initial investment fail.

/ / /

/ / /

*(ii) Second $500,000 investment*

On November 20, 2011, plaintiff asked defendant "How many investors do you have [in the Fund]?" (Ex. 10.)

Defendant responded on the same date by stating, "*[S]everal other close friends . . . are now liquidating some assets in order to participate.*" (*Id*. (emphasis added).)

On November 26, 2011, plaintiff asked defendant "how big" the Fund would be. (Ex. 11.)

Defendant responded, "I can only say that it will probably not be very big, depending on how it is defined. . . . *My first goal is to get to 20-30 million. If the fund does well, perhaps we can get to 100 mio by end of 2012.* Those are my parameters right now, which of course can always change depending on conditions. *We haven't even announced the fund yet, officially. Only a few of my good friends know about it.*" (*Id*. (emphasis added).)

On November 29, 2012, plaintiff told defendant he had decided not to invest the second $500,000 because (he thought) defendant had not invested any of his own money in the Fund. (Ex. 13.)

Defendant responded that he had invested $200,000. (*Id.*)

Plaintiff sent his second $500,000 investment to defendant between December 5, 2011 and December 11, 2011; it was invested in the Fund on December 14, 2011.

Thus, in response to plaintiff's direct question regarding the number of investors or the size of the Fund, defendant did not provide a direct answer. Rather, he wove a narrative in which a select group of high-wealth individuals were on the brink of investing. It was not until May 14, 2012, that defendant unambiguously stated that he and plaintiff were the only investors. Defendant had a duty to fully disclose all material information to plaintiff when seeking plaintiff's second investment. (*See* discussion, *infra*.) His failure to disclose that plaintiff was the sole

/ / /

27

outside investor before plaintiff made his second investment constitutes concealment of a material fact, as well as silence in the face of a duty to speak. (*See id.*)

However, with respect to fraud by misrepresentation, only the November 20, 2011 statement that "other close friends . . . are now liquidating some assets in order to participate" was made before plaintiff's second investment. That statement was clearly false.

(b)    <u>Knowledge and scienter</u>.

Defendant was well aware of which potential investors he had communicated with and what their responses were. Accordingly, he had no reason to believe that anyone, much less "several" of his friends were "liquidating assets" in order to participate. It is also clear that he acted with the intent to induce plaintiff to make his second investment in the Fund. Simply stated, defendant overstated the demand for the Fund because he wanted to enhance its attractiveness to plaintiff.

Finally, the Court notes that under Delaware law, "*scienter* can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth." *In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013) (italics in original). Defendant's scienter may be readily inferred from the clear falsity of his statement.

(c)    <u>Reliance</u>.

*(i)*    *Actual reliance*

In order to prove fraud, a plaintiff must show that he actually and justifiably relied on the defendant's statements and/or omissions. *Wayport*, 76 A.3d at 325. Defendant argues that the only factor plaintiff *actually* relied on in investing in the Fund was defendant's assurance that he would personally manage the Fund. (Def. Mem. at 3 (citing 2TT 53:10-14).) The Court finds otherwise. Plaintiff was credible in testifying that defendant's claim of other committed investors factored into his decision to invest the second $500,000. Furthermore, his subsequent emails

/ / /

28

1    regarding the number of investors amply demonstrate that he was anxious not to be

2    the only one.

3                    *(ii)    Justifiable reliance*

4          In addition, plaintiff justifiably relied on defendant's representations.

5    Plaintiff's only way of discovering how many investors were in the Fund was to ask

6    defendant.  Defendant created the impression that the entry of other investors into the

7    Fund was a foregone conclusion.  At the time, the parties were friends – close enough

8    that plaintiff had thrown a birthday party for defendant.  Under these circumstances, it

9    was reasonable for plaintiff to take defendant's statements at face value.

10         Defendant argues that plaintiff's reliance was unreasonable in light of

11   defendant's "inconsistent statements" regarding the number of investors.  In

12   particular, defendant points to (1) his November 1, 2011 email, in which he stated

13   that he had not "announced the fund yet" (Ex. 110); and (2) his December 13, 2011

14   email, in which he stated that he "ha[d] not done any contacting of potential

15   subscribers yet."  (Def. Mem. at 5-6, 14.)  These statements were not, in fact,

16   inconsistent with defendant's other representations.  As to the November 1st email,

17   the term "announce[ment]" connotes an official statement to a broad audience, rather

18   than a series of informal overtures to personal friends.  Plaintiff had been recruited by

19   the latter method, so he would have no reason to believe that the lack of an

20   "announcement" meant that no other investors had been contacted.

21         And as detailed above, the December 13th email appeared to plaintiff to

22   distinguish between newsletter subscribers, whom defendant had not contacted, and

23   his personal friends, who were preparing to invest.  Accordingly, it was not

24   unreasonable for plaintiff to believe, as he testified, that defendant had personal

25   friends lined up to invest in the Fund, even though he had yet to officially announce

26   the Fund.[19]  In any event, the December 13th email was sent after plaintiff already had

27

28         [19]  Therefore, the Court rejects defendant's argument that by December 13,
     2011, plaintiff knew, or should have known, that he was the only outside investor.

submitted his second investment.  Thus, it could not have alerted plaintiff to the lack of investors before he relied on the earlier statement.

(d)     Resulting harm.

To be actionable, a fraudulent statement or omission must cause harm.  The necessary causal connection has two dimensions.  First, "the misrepresentation or omission must be a factual cause of the harm in the sense that the harm would not have occurred but for the misrepresentation or omission."  *Vichi*, 85 A.3d at 815; *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 32 (Del. Ch. 2009).  Second, "the misrepresentation or omission also must be a legal cause of the harm, meaning that it must be a sufficiently significant cause of the harm to impose liability."  *Vichi*, 85 A.3d at 815-16; *NACCO*, 997 A.2d at 32 ("The second limitation recognizes that the harm flowing from an event in the but-for sense at some point becomes too attenuated to give rise to liability. Our law will not award damages for a kingdom when the wrong concerns a two-penny nail.")

Similarly, a Section 10(b)(5) plaintiff must show that (1) "but for the fraud, the plaintiff would not have engaged in the transaction at issue" (transaction causation); and (2) there is a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff" (loss causation).  *In re Daou Sys.*, 411 F.3d at 1025.

As to loss causation, "[a]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages."  *In re Daou Sys.*, 411 F.3d at 1025 (internal quotation marks omitted).  In cases of fraud based on omission or nondisclosure, "many courts have interpreted legal or proximate causation as including a 'loss causation' requirement,

---

The Court thus finds that the three-year limitations period was tolled by defendant's fraudulent concealment of facts providing the basis for plaintiff's claim until May 14, 2012. *See Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006).

meaning that the loss ultimately must be caused by the materialization of the concealed risk." *Vichi*, 85 A.3d at 816 (internal quotation marks omitted).[20]

Plaintiff contends that he suffered damages because he was induced by defendant's misrepresentations and omissions to invest $500,000 in the Fund, and then a further $500,000, and he lost his entire amount. (FPTCO at 9, 12, 16.) Plaintiff has failed to prove any misrepresentation or intentional omission with respect to his initial investment. With respect to the second investment, plaintiff has proven the factual and transactional causation elements of his fraud claims. Plaintiff would not have invested in the Fund but for the misrepresentations, and he would not have lost his investment if he had not invested in the Fund.

However, plaintiff has failed to prove that the lost investment value was proximately caused by there being only two investors in the Fund. Where the claimed loss is a decline in an investment's value after the plaintiff has been fraudulently induced to buy it, courts "have consistently rejected loss causation arguments . . . that a defendant's fraud caused plaintiffs a loss because it 'induced them to buy the shares' - because the argument 'renders the concept of loss causation meaningless by collapsing it into transaction causation.'" *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013). Here, the Fund started declining in value from its inception, but the evidence fails to show that the decline was the result of anything other than market forces and/or trading decisions. Thus, even if there had been more outside investors, plaintiff's investment would have declined by the same amount. Therefore, plaintiff cannot show proximate cause or loss causation with respect to the false statement that close friends of defendant were liquidating assets to invest in the Fund.

---

[20] To illustrate, a person who misrepresents a company's financial condition is not liable to a purchaser who relies on the misinformation if the shares go down because of the sudden death of the corporation's leading officers. *Vichi*, 85 A.3d at 816.

31

The Court also finds that plaintiff cannot recover defendant's management fee based on the fact that he was the single outside investor. Defendant's management fee was based on plaintiff's capital account balance, which would have been the same whether or not there were other outside investors in the Fund. And as to the Fund's startup costs, plaintiff has not proven that he incurred them separately from the administrative charges to his capital account.

Plaintiff can recover the difference between the ongoing administrative costs and fees he incurred through June 2012 and the costs and fees he would have incurred had there been more investors.[21] However, plaintiff's administrative fees and costs were deducted from his account each month. This means that for any period in which plaintiff recovered the decline in value of his investment, his recovery would include the administrative fees and costs he was charged during that period.

As discussed below, the Court finds that with respect to his claim for breach of fiduciary duty, plaintiff is entitled to the decline in value of his second $500,000 investment through June 30, 2012. In order to avoid a duplicate recovery, plaintiff's recovery of administrative fees and costs on the instant claim must be reduced

/ / /

/ / /

/ / /

_____

[21] Under Delaware law, a party has "a general duty to mitigate damages if it is feasible to do so . . . ." *American Gen. Corp. v. Cont'l Airlines Corp.*, 622 A.2d 1, 11 (Del. Ch.), *aff'd*, 620 A.2d 856 (Del. 1992). Defendant argues that plaintiff failed to mitigate his damages because he failed to avail himself of defendant's offers to exit the Fund. (Def. Mem. at 14.) With respect to (1) the decline in plaintiff's investment; (2) defendant's management fees; and (3) the Fund's start-up expenses, this defense, while well-taken, is nonetheless mooted by the Court's findings, *supra*. With respect to the ongoing operational costs, defendant's argument has merit. Plaintiff had a duty to mitigate his damages once he learned he was the single outside investor on May 14, 2012. The earliest he could have exited the Fund was the end of June. Accordingly, his damages are capped as of that date.

accordingly. Therefore, the Court finds that plaintiff is entitled to $1645.93 on this claim.[22]

### (2) The Fund's trading strategy.

Plaintiff also bases fraud and securities fraud claims on (1) the May 14, 2012 email, in which defendant told plaintiff that the Fund was "supposed to be a long term investment"; (2) the June 8, 2012 report and letter; and (3) defendant's failure to disclose, prior to January 25, 2013, the Fund's shift to a shorter-term strategy. (FPTCO at 10, 12, 16.) Plaintiff has not proven these claims.

### (a) Falsity and omission; knowledge.

Defendant does not dispute that the Fund's trading strategy changed at some point to what he characterizes as a "shorter term, more active trading strategy." (Def. Mem. at 7.) As defendant points out, however, plaintiff's own expert testified that the change did not occur until late May or early June – *i.e.*, after the May 14th email. (*Id.* at 7-8.) Plaintiff has pointed to no evidence demonstrating an earlier start date. Nor is there evidence demonstrating that when he wrote the May 14th email, defendant did not intend to continue with the longer-term strategy he had outlined to plaintiff.

---

[22] Plaintiff did not break down the ongoing charges by month. Thus, the Court bases its damages calculation on the monthly average ($(2,578.31 + 4,368.83) \div 13$), multiplied by seven (for the months of December 2011 through June 2012) and divided by two (as it is based on one-half of plaintiff's total investment), for a total of $1870.38. In addition, the Court will assume that if defendant's representations had been truthful, plaintiff would have owned approximately 10% of the Fund's assessments under management rather than 83%. Assuming that the charges were based on the limited partner's percentage of assets under management, at 10% ownership plaintiff would have incurred approximately 12% of the charges he incurred at 83% ownership. Therefore, plaintiff is entitled to recover 88% of $1870.38, for a total of $1645.93. The Court's calculation is imprecise as a result of these assumptions. However, this lack of precision does not preclude recovery. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1078 (Del. 1983) ("[T]he mere difficulty or lack of certainty in calculating the amount of damages does not prevent an award to the successful party").

33

Accordingly, the Court finds that defendant's May 14th statements regarding the Fund's investment strategy were not false when made. Therefore, they cannot serve as the basis of a fraudulent misrepresentation claim. *Grunstein v. Silva*, No. CIV. A. 3932-VCN, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) ("A party's failure to keep a promise does not prove the promise was false when made").

Similarly, plaintiff has failed to prove that any statements in the June 8, 2012 report and letter were false when made. As detailed above, those documents heavily emphasized that the Fund had a long-term, macrowave-focused investment strategy. Short-term trading, they emphasized (in no less than bold print), was not the goal. However, the evidence is scant that any change in trading strategy had occurred (or was contemplated) at that time. Although the evidence suggests that defendant had increased his use of short selling, short selling was always part of the overall strategy.

However, defendant admitted that he switched to a "more active" trading approach at some point in the third quarter. The record supports large trading volumes in September 2012 through December 2012, with a marked increase in November 2012. However, plaintiff has provided no evidence as to the pre-September 2012 trading volumes. Nonetheless, given defendant's admission, the Court concludes that starting at some point in September 2012, defendant changed his strategy to include rapid turnover of the positions held by the Fund.

The November 5, 2012 letter from defendant to plaintiff, included the following statements:

> We are not wedded to any market scenario. *If the facts change, we will change our strategy as well. . . .*
>
> *We will reevaluate the situation at the end of the current quarter and discuss the future with our investors [sic] at that time.*

(Ex. 37 (emphasis added).)

These statements were true, but omitted the salient information that defendant already had changed the trading strategy. At the time this statement was made

34

defendant well knew that he had been engaging in a different strategy, relying on rapid turnover of the Fund's investments. Thus the statement, while true, was materially misleading by omitting information necessary to dispel the implication that the change in trading strategy had not yet occurred.

(b)     Scienter.

Defendant's intent at that point can only be determined by inference. It certainly appears that defendant was concealing the change in strategy from plaintiff. It seems likely that defendant was trying to buy time to try and obtain better results from the Fund before telling plaintiff that, at least temporarily, the original strategy for the Fund had to be abandoned.

Defendant argues that he "had no motivation for misleading plaintiff," because he had the right to engage in whatever investment strategy he deemed appropriate and was not obligated to disclose any changes therein to plaintiff. (Def. Mem. at 10-11.) Defendant points to (1) the PPM's Wide Latitude Provision, which states that the general partner need not obtain the limited partners' "approval" for trading strategy changes; and (2) plaintiff's expert's testimony that defendant had no obligation under the Fund documents to disclose such changes (3TT 72:11-22). These arguments do not fully address defendant's conduct here.

Although the PPM provided defendant with full authority to change trading strategy without seeking approval, here defendant not only changed trading strategies but made a statement to plaintiff strongly implying that no change had been made. The Court infers that defendant's intent was to avoid (or postpone) a request from plaintiff to withdraw his investment from the Fund.

(c)     Reliance.

The Court finds that plaintiff has not demonstrated that he actually relied on the omissions in the November 5, 2012 letter. Plaintiff was impressed with defendant's trading ability in short sales and short term trading and demonstrated time and again that he wanted defendant to use this expertise in handling the Fund. The most

35

compelling evidence, however, is plaintiff's approval of the more active trading approach when notified in January 2013 that defendant found it necessary to change strategies. Notwithstanding this knowledge, and plaintiff's ability at that time to have withdrawn his investment,[23] plaintiff maintained his investment in the Fund for another full year, including after the Fund had staged a recovery to a NAV of $517,471.17 on May 31, 2013. (Ex. 135 at GOOD 0223-25.)

The Court also notes that, unlike his constant inquiries regarding the number of investors, plaintiff never expressed a concern about the trading strategy, even after being told in January 2013 to notify defendant if he did not agree with the change.

Having failed to demonstrate that he relied to his detriment on defendant's temporary concealment of a change in trading strategies, plaintiff's fraud claim and securities fraud claim based on such change are without merit.

B.  Breach of fiduciary duty.

Under Delaware law, a claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty. FPTCO, p. 6; *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

(1)  Duty.

As the Court held in its MSJ Order, a director, member, or officer of a corporate entity serving as the general partner, who exercises control over the partnership's property, owes a fiduciary duty of loyalty directly to the partnership and its limited partners. *See, e.g., In re USA Cafes, L.P. Litig.*, 600 A.2d 43, 49-50 (Del. Ch. 1991); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180-81 (Del. Ch. 1999); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671-72 (Del. Ch. 2012) (noting that with respect to such director, member, or officer,

_____

[23]  By January 2013, the one year lock-in period had already expired. Thus, plaintiff could have withdrawn his investment at any time without obtaining any accommodation from defendant.

the duty owed to limited partners "has not been extended beyond duty of loyalty claims"). As defendant (1) was Macro Wave's sole member and (2) exercised exclusive control over the Fund's property, defendant owed plaintiff a duty of loyalty once plaintiff invested in the Fund.

A general partner's duty of loyalty, absent contractual modification, "parallels that of a corporation's director." *Davenport Grp. MG, L.P. v. Strategic Inv. Partners, Inc.*, 685 A.2d 715, 722 (Del. Ch. 1996); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981). Thus, general partners owe limited partners a duty of full disclosure, *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1023 (Del. Ch. 2010), and a duty not to speak falsely in communications with them, *id*; *see also Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund*, 829 A.2d 143, 157 (Del. Ch. 2003). The duty of full disclosure generally requires the general partner to fully disclose all material information reasonably available *when seeking partner action*. *Lonergan*, 5 A.3d at 1023.

The PPM's Wide Latitude provision does not clearly provide that the general partner need not consider the interests of the limited partners. Without such clear language, even a provision granting the general partner "sole discretion" in a matter cannot abrogate the general partner's fiduciary duty of loyalty toward the limited partners.[24] *See Miller v. Am. Real Estate Partners, L.P.*, No. CIV.A.16788, 2001 WL 1045643, at *9-*10 (Del. Ch. Sept. 6, 2001) (holding that partnership agreement failed to eliminate general partner's fiduciary duty of loyalty with sufficient clarity, even where general partner had contractual power to act in "sole discretion"); *see also Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC*, No. CIV.A. 5502-CS, 2011 WL 3505355, at *32 (Del. Ch. Aug. 8, 2011) (holding that partnership agreement

_____

[24] Because the Court finds that the Wide Latitude Provision has no bearing on whether defendant had the duty to disclose the change in strategy to plaintiff, the Court need not decide whether, or to what degree, the PPM controls the parties' relationship.

37

provision giving general partner of hedge fund "sole discretion" to waive conditions for exiting Fund did not allow general partner to fail to waive conditions solely for its own self-interest); *compare Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977 (Del. Ch. 2001) ( where limited partnership agreement gave general partner "'sole [and complete] discretion'" in particular matter, and clarified that general partner was "'entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest or factors'" affecting limited partners, agreement clearly precluded application of traditional duty of loyalty).

Therefore, to the extent defendant's fiduciary duty of loyalty imposed obligations on defendant, the Wide Latitude Provision did not vitiate those obligations.

    (2)    <u>Breach and damages.</u>

        (a)    <u>Misrepresentation regarding the number of investors</u>.

            *(i)    Breach*

Defendant made the misrepresentation that others were liquidating assets to participate at the time he was requesting plaintiff to take action (*i.e.*, contribute an additional $500,000 to the Fund). This misrepresentation breached the fiduciary duty of loyalty, which requires candor in providing information to a partner when requesting the partner to take action.

Defendant argues that he did not breach his duty of loyalty because he did not put his own personal interests ahead of plaintiff's. (Def. Mem. at 12-13.) Defendant asserts that as an investor in the Fund, his interests were aligned with plaintiff's, as evidenced by the fact that he lost money when the Fund lost money. (*Id.*) He further contends that the fee he earned from managing the Fund was too small to "incentivize [defendant] to keep [plaintiff's] money in the fund at all costs." (*Id.*) Certainly, acting in one's self-interest to the detriment of the limited partner could constitute a breach of the duty of loyalty. *See*, *e.g.*, *Gantler v. Stephens*, 965 A.2d 965, 707 (Del.

38

2009).  However, defendant cites no authority for the proposition that a materially false communication made by the general partner is not actionable unless the general partner placed his own interests ahead of the interests of his partner.  Delaware authority found by the Court seems to be to the contrary.  *E.g., Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest").

Moreover, with respect to a communication made when seeking partner action, Delaware law eliminates many of the common law fraud requirements for recovery.  As explained by the Delaware Supreme Court:

> An action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages.  Instead, such actions require the challenged disclosure to have a connection to the request for shareholder action. The essential inquiry in such an action is whether the alleged omission or misrepresentation is material.  Materiality is determined with respect to the shareholder action being sought.

*Malone v. Brincat,* 722 A.2d 5, 12 (Del. 1998).

Therefore, some of the impediments to plaintiff's fraud and securities fraud claims discussed above are not applicable to this claim.  The parties do not dispute materiality and plaintiff has demonstrated that the existence of other investors was important to him (as it would be important to any reasonable investor in plaintiff's position at the time) in deciding to invest the additional $500,000.

### (ii)    Damages

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."  *Thorpe*, 676 A.2d at 445.  The Court is not constrained by, *e.g.*, concepts such as transactional damages or loss causation.  *See id.* at 444-45.  As the Delaware Supreme Court has stated:

> Where there is breach of the duty of loyalty, as here,
> potentially harsher rules come into play and the scope of
> recovery for a breach of the duty of loyalty is not to be
> determined narrowly [because t]he strict imposition of
> penalties under Delaware law are designed to discourage
> disloyalty.  Therefore, the Court of Chancery's powers are
> complete to fashion any form of equitable and monetary
> relief as may be appropriate.

*Gotham Partners, L.P. v. Hallwood Realty Partners*, L.P., 817 A.2d 160, 176 (Del. 2002) (alteration in original; internal quotation marks omitted).  Here, the Court has weighed the equities and finds defendant liable for the decline in the value of plaintiff's second ($500,000) investment.

Defendant argues that plaintiff failed to mitigate his damages.  In this regard, plaintiff was explicitly informed in May 2012 that defendant and he were the only investors.  At that time, defendant provided plaintiff the opportunity to withdraw his investment, effective June 30, 2012.  The NAV of the Fund on June 30, 2012 was $804,021.26.  (Ex. 130 at 5.)  Plaintiff turned down the offer and elected to proceed with his investment in the Fund even though defendant and he were the only investors.  Under these circumstances, defendant should not be liable for any additional losses sustained by the Fund after June 30, 2012 on this claim.

Plaintiff's $500,000 investment represented a 41.5 % interest in the Fund. Therefore, plaintiff is entitled to damages in the amount of $166,331.18 on this claim.[25]

(b)     Omission regarding change in trading strategy.

As discussed above, the Court has found that the November 5, 2012 letter was misleading by failing to disclose that defendant already had changed his primary trading strategy.  In *Malone v. Brincat*, the Delaware Supreme Court held that "Delaware law . . . protects shareholders who receive false communications from

---

[25]  500,000 - (804,021.26 × .415) = 166,331.18.

40

directors[,] even in the absence of a request for shareholder action." 722 A.2d at 14. Where a request for shareholder action is not present, "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder" violate the duty of loyalty. *Id.* at 9; *see id.* at 10.

A shareholder (or in this case, limited partner) alleging breach of the duty of loyalty in the absence of a request for shareholder action must prove more elements than required for a claim of breach where action was requested. First, as indicated above, the shareholder must prove that the fiduciaries "'knowingly disseminate[d] false information,'" *Metro Comm. Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157-58 (Del. Ch. 2004) (quoting *Malone*, 722 A.2d at 9), or deliberately concealed material information, *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 389-90 (Del. Ch. 1999). "This level of proof is similar to, but even more stringent than, the level of scienter required for common law fraud." *Metro Comm.*, 854 A.2d at 157-58. Second, the shareholder must prove "reasonable reliance," *id.*, and causation and damages, *A.R. DeMarco Enterprises, Inc. v. Ocean Spray Cranberries, Inc.*, No. Civ.A. 19133–NC, 2002 WL 31820970, at *4 n.10 (Del. Ch. Dec. 4, 2002) (citing *Malone*, 722 A.2d at 11). "Therefore, the board's duty to be honest has not changed, only what the plaintiff must show at trial" to show the breach of that duty. *De Marco Enterprises*, 2002 WL 31820970, at *4 n.10.

As discussed, it is clear that in the November 5, 2012 letter, defendant deliberately concealed material information. However, the Court has found that plaintiff did not actually rely on the omissions in the letter. (*See* discussion, *supra*.) Because plaintiff cannot prove reliance, he cannot hold defendant liable for breach of the duty of loyalty with respect to the change in trading strategy.

(c)     Operating the Fund with one outside investor and limited assets.

Plaintiff also claims that defendant breached his duty of loyalty to plaintiff by operating the Fund with only one outside investor (*i.e.*, plaintiff) and $1.2 million in assets, which was inherently uneconomic. (FPTCO at 5.) Plaintiff has not proven

41

this aspect of his breach of fiduciary duty claim. Plaintiff's evidence shows only that the Fund's hurdle rate (5%) was more expensive than that of a managed brokerage account. However, even with additional investors, the Fund – and in fact any hedge fund – would have been more expensive than a managed brokerage account.

Plaintiff's expert did not testify that hedge funds, and/or investments that are more expensive than managed brokerage accounts, are inherently uneconomic. Nor did he speak to the likelihood of clearing a 5% hurdle rate, or whether a lower hurdle rate should be considered the upper limit for "economic" investments. Without such evidence, the Court cannot conclude that the defendant breached his duty of loyalty in this regard.

## III. CONCLUSION

For the foregoing reasons, defendant is liable to plaintiff for breach of the fiduciary duty of loyalty with respect to the number of investors.

Plaintiff is entitled to damages in the sum of $166,331.18 plus $1645.93. Plaintiff is also entitled to his costs of suit.

DATED: August 3, 2017

                    /S/FREDERICK F. MUMM
                    FREDERICK F. MUMM
                    United States Magistrate Judge